MARÍA PUIG VDA. DE JOSÉ P. CHANDRI, por sí y a nombre de sus menores hijos JOSÉ y MARÍA CHANDRI PUIG, demandantes y apelantes, *v.* RAMÓN SOTOMAYOR y su esposa CONCEPCIÓN FLORES SOLÁ, y JUAN SOLÁ GONZÁLEZ y su esposa MANUELA FLORES SOLÁ, demandados y apelados.

Núm. 7711.—*Sometido:* Abril 13, 1939. *Resuelto:* Julio 13, 1939.

*Francisco González Fagundo* y *José Puig Morales,* abogados de los apelantes; *Arturo Aponte* y *Faustino R. Aponte,* abogados de los apelados.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Versa este pleito sobre cobro de una deuda garantizada con hipoteca. Se alegó en la demanda que los cónyuges demandados Sotomayor-Flores por escritura pública de enero 30, 1923, constituyeron primera hipoteca a favor del causante de los demandantes en garantía de un préstamo de dos mil dólares sobre una casa situada en Caguas en solar del municipio, comprometiéndose a mantenerla asegurada contra incendio por cuatro mil dólares durante la vigencia del gravamen;

Que los deudores vendieron la casa hipotecada a la demandada Manuela Flores asistida de su esposo el otro demandado Juan Solá, por seis mil dólares de los cuales

dejaron dos mil en poder de la compradora para el pago de la hipoteca;

Que por escritura pública los demandados esposos Solá-Flores declararon que doña Claudina Valdés les había dado en préstamo el día del otorgamiento mil quinientos dólares para ser devueltos en julio 17, 1925, y para garantizar el contrato hipotecaron la repetida casa, comprometiéndose a asegurarla y a endosar la póliza a su acreedora y así lo hicieron en la Royal Exchange Ass. Corporation y en la National Fire Ins. Co.;

Que en julio 26, 1926, la casa fué destruída por un incendio casi totalmente, quedando de ella sólo escombros de valor insuficiente para cubrir el crédito reclamado, habida cuenta de que el solar pertenece al municipio;

Que los esposos demandados Solá-Flores reclamaron de las compañías aseguradoras y cobraron de la primera $1,114.64 y de la segunda $825.98 por cuyas sumas firmaron recibos conjuntamente con su acreedora hipotecaria la señora Valdés, y

Que los demandados no han pagado a los demandantes que son los únicos y universales herederos del primitivo acreedor hipotecario señor Chandri, la deuda ni sus intereses.

Se pide una sentencia solidaria en contra de los cuatro demandados condenándolos al pago de dos mil dólares de principal con más los intereses, las costas y los honorarios de abogado, procediéndose a vender el remanente de la finca hipotecada o cualquier derecho inmanente a ella y si el producto no alcanzare que se proceda entonces a ejecutar el balance de la sentencia en otros bienes de los demandados.

Los demandados esposos Sotomayor-Flores contestaron aceptando el hecho de la constitución de la hipoteca, aclarando que todo lo que se consignó en la escritura sobre el seguro lo fué en su cláusula quinta, que dice:

"QUINTA: La casa descrita se halla asegurada contra incendio por la cantidad de cuatro mil dólares en la Compañía Great American Insurance Co., New York, según póliza Núm. 10799, cuya póliza deja

el deudor en poder del acreedor como garantía adicional del presente préstamo, obligándose, además, dicho deudor a tener vigente por su cuenta el expresado seguro, por todo el tiempo de este préstamo, y la falta de cumplimiento de esta condición, dará lugar al vencimiento de la hipoteca para su inmediata ejecución.''

Alegaron además que si bien la casa hipotecada aparecía a su nombre, pertenecía en verdad a los otros demandados los esposos Solá-Flores siendo ellos los que concertaron el préstamo con y recibieron el dinero del apoderado del señor Chandri, señor Jiménez, todo lo que constaba a éste que siguió entendiéndose con ellos directamente, y que el traspaso que de la propiedad hicieron a los otros demandados esposos Solá-Flores lo fué por la consideración nominal de seis mil dólares estando de acuerdo el dicho apoderado del señor Chandri.

Como materia nueva alegaron que habiendo surgido desavenencia en el matrimonio Solá-Flores y a los fines de que el marido no dispusiera de la casa, se la traspasaron a su concuñado Sotomayor y luego éste a requerimiento de marido y mujer que habían concertado con F. Jiménez apoderado de Chandri la hipoteca que tratan de cobrar los demandantes, firmó la escritura constitutiva de la misma, sin nada percibir, entendiéndose en todo Jiménez directamente con Solá, otorgando luego ambos el documento privado de prórroga de la hipoteca que se transcribe.

Se pidió por los demandantes la eliminación de ciertas alegaciones de la contestación y de toda la materia nueva y fué negada por la corte. Celebrado el juicio, quedó el pleito resuelto por la siguiente sentencia:

''Sometido definitivamente este caso a la consideración de la Corte, al incorporarse a sus autos la deposición del testigo Juan Solá González; examinados los autos y considerada minuciosamente toda la evidencia practicada durante la sustanciación del juicio, es inevadible la conclusión de que ni el demandado Ramón Sotomayor ni su esposa Concepción Flores Solá tienen responsabilidad alguna real y legalmente contraída para con la parte demandante que, por otro lado, ya ha obtenido sentencia contra sus verdaderos deudores, y se dicta

sentencia declarándose por tanto, sin lugar la demanda contra los expresados codemandados esposos Sotomayor-Flores, debiendo la parte demandante satisfacer a dichos esposos codemandados las costas en que los mismos hayan incurrido con motivo de este litigio, incluyendo dichas costas una suma, que se estima razonable, de $500.00 para honorarios de abogado.''

No conformes los demandantes, interpusieron la presente apelación. Señalan seis errores cometidos a su juicio por la corte sentenciadora, 1, al negar la eliminación de ciertos extremos de la contestación; 2, al infringir los artículos 25 y 101 de la Ley de Evidencia; 3, al admitir en evidencia cierto documento privado; 4, al admitir las declaraciones de Mercedes y Ramón Sotomayor; 5, al declarar sin lugar la demanda, contrario a derecho y a la prueba, y 6, al condenar en costas a los demandantes fijando en quinientos dólares los honorarios de abogado.

Discutiendo su primer señalamiento de error recuerdan los demandantes que su demanda es jurada e invocan el artículo 110 del Código de Enjuiciamiento Civil en aquella parte que dispone ''pero si se jurare la demanda, la negación de cada alegación impugnada deberá ser específica, o hacerse por afirmación absoluta o según información y creencia del demandado.''

Seguidamente sostienen que aceptado por los demandados el otorgamiento de la escritura de hipoteca, estaban impedidos de levantar las otras cuestiones que levantaron en su contestación ya que obligados por el contrato cualesquiera que fueran las relaciones existentes entre Sotomayor y Solá, aún teniendo conocimiento de ellas el apoderado Jiménez, no podían perjudicar a los demandantes herederos del acreedor Chandri que contrató con quienes del Registro aparecían ser los dueños, motivo por el cual procedía la eliminación solicitada. Citan los artículos 25 y 101 de la Ley de Evidencia y el caso de *Valdés et al.* v. *Sucesión Gandía,* 41 D.P.R. 554.

A nuestro juicio la corte sentenciadora no cometió el error que se le atribuye. Es cierto que los demandados Sotomayor-Flores aceptaron en su contestación el hecho primero de la demanda o sea el que se refiere a la constitución de la hipoteca a favor del causante de los demandantes, pero es lo cierto también que en las siguientes alegaciones exponen hechos que de ser exactos equivalen a una negación de la eficacia del gravamen en cuanto a los repetidos demandados.

"No es necesario frasear un 'traverse' en la negativa. Por el contrario, la alegación de un hecho contrario a lo alegado en la demanda es equivalente a una negativa. Por lo tanto, una defensa en la que se alega una apropiación ilícita de la colateral de una hipoteca debe interpretarse como negando el que se haya efectuado una venta válida de tal colateral. Y una alegación al efecto de que la relación entre las partes era de coarrendatarios niega afirmativamente una alegación de sociedad." 1 Bancroft's Code Pleading, Practice and Remedies, Ten Year Suplement, 1937, pág. 204.

Conocemos las alegaciones de la contestación impugnadas por el resumen que de ellas hicimos y basta examinarlas a la luz de lo resuelto por esta misma corte en los casos de *Vilá* v. *Torres,* 1 S.P.R. 439, *Rosado* v. *Rosado,* 17 D.P.R. 471, *Horton* v. *Robert,* 11 D.P.R. 176, *Ribas* v. *Voight,* 1 S.P.R. 219 y *Pinto* v. *Drew,* 45 D.P.R. 595, invocados por los apelados, para concluir que pueden hacerse y que constituyen contestación y defensa suficientes a las que en contra de los demandados esposos Sotomayor-Flores contiene la demanda.

Un contrato de hipoteca simulado en cuanto a la persona que se hace aparecer como dueña del inmueble hipotecado, celebrado con conocimiento y de acuerdo con el verdadero dueño y con el propio acreedor por medio del apoderado que a su nombre interviene, carece de eficacia contra el dueño simulado. La tiene, si es cierta la transacción, contra la finca y su dueño verdadero.

Y si ello es así, ¿cómo no va a poder alegarse la simulación en alguna forma en la contestación por el demandado a quien libera de la responsabilidad que le exige el demandante? A nuestro juicio es claro que puede.

█ Los señalamientos de error segundo, tercero y cuarto guardan estrecha relación con el primero. Argumentándolos sostienen los apelantes que la corte infringió los artículos 25 y 101 de la Ley de Evidencia—387 y 463 del Código de Enjuiciamiento Civil, ed. 1933—porque aceptando el hecho del otorgamiento de la escritura de hipoteca y no atacada la validez del préstamo, ni alegando fraude o ilegalidad, no cabe la alteración de los términos del contrato, debiendo subsistir la presunción de verdad de los hechos relatados en el mismo, errando en tal virtud la corte al admitir en evidencia el documento privado sobre prórroga de la hipoteca otorgado por Jiménez como apoderado de Chandri y Juan Solá, y al permitir que declararan Mercedes Sotomayor y Ramón Sotomayor, porque tanto el documento como las declaraciones tendieron a variar los términos del contrato admitido. Invocan los casos de *Villanueva v. Suárez,* 40 D.P.R. 47; *Ramírez v. Pumares,* 28 D.P.R. 121, *López v. Lizardi,* 27 D.P.R. 755, 756, *Nicorelli v. Ernesto López y Compañía,* 26 D.P.R. 55, 58, *Matson v. Goico,* 18 D.P.R 702, 706, *Bennett v. Boschetti,* 31 D.P.R. 855, *Banco Comercial v. Arguinzonis,* 35 D.P.R. 284, *Roig Commercial Bank v. Valladares,* 38 D.P.R. 439, *Cintrón y Aboy v. Solá,* 22 D P.R. 262, *Crédito y Ahorro Ponceño v. Beiró,* 32 D.P.R. 817 y *National City Bank v. Martínez Llonín,* 41 D.P.R. 163.

Lo dicho en relación con la no existencia del primer error es fundamento para declarar que tampoco se cometieron los errores segundo, tercero y cuarto, porque si las alegaciones cuya eliminación se negó a decretar la corte estuvieron bien formuladas, claro es que pudo presentarse y debió admitirse evidencia sobre las mismas en el juicio.

Hemos examinado las decisiones invocadas en su favor por los apelantes y aunque guardan relación con la cuestión

aquí envuelta, no tienen el alcance que parece dárseles. Aquí se trata de un caso de simulación en cuanto al verdadero dueño de la finca hipotecada, con intervención del dueño real y del acreedor hipotecario por su apoderado.

Todo cuanto exponen en su alegato los apelantes como fundamento de su quinto señalamiento de error es lo que sigue:

"Al argumentar este error tenemos que partir de la base de los errores primero y segundo o sea que las alegaciones de la contestación han debido ser eliminadas, y que aún admitiendo que fueran permisibles dichas alegaciones y permanecieran formando parte de la contestación no son bastantes para anular el derecho de los demandantes a cobrar el resto del crédito hipotecario de Ramón Sotomayor que era un deudor solidario.

"Admitiendo las declaraciones de Mercedes Sotomayor y de su padre Don Ramón, dichas declaraciones no pueden tener el alcance que les ha dado el Juez sentenciador al dictar su sentencia, o sea que con dicha única prueba se exime de responsabilidad a Ramón Sotomayor y su esposa Concepción Flores Solá, porque sería destruir el valor probatorio de los documentos públicos admitir tal hecho.

"Ramón Sotomayor y su esposa no alegan incapacidad, ni han alegado fraude sino que ellos como parientes de Juan Solá González se prestaron a firmar el documento de hipoteca, recibieron el cheque, lo endosaron al señor Solá González y todavía al vender la finca hipotecada a este último ratificaron dicho contrato al mencionarlo como una carga y al reservarse Solá González el importe del crédito hipotecario. Sería una burla a los más elementales principios del derecho civil permitir semejante clase de alegaciones y darle valor probatorio a semejante prueba.

"La sentencia es contraria a la prueba porque la que se ha presentado o sea las declaraciones de dos personas de apellido 'Sotomayor' y la de Juan Solá González no puede destruir un contrato de préstamo garantizado con hipoteca que aparece de una escritura pública, documento solemne y que tiene todas las formalidades legales para que tenga validez y además porque permitir tal prueba infringe los preceptos que hemos citado de la ley de evidencia. Hay que tener en cuenta que a la fecha en que se presentó la demanda, Chandri había fallecido y que las declaraciones de Sotomayor no tienen valor de ninguna especie de acuerdo con los preceptos de la ley de evidencia, y es contraria a derecho dicha sentencia por las infracciones legales a que antes nos hemos referido."

Se ve, pues, que siguen influenciados por su criterio rígido de la ley y por su concepto de la solemnidad de los documentos públicos.

Hemos analizado la evidencia y es convincente en cuanto a la simulación.

Que Jiménez tenía plenos poderes para representar a Chandri, surge de la propia escritura de hipoteca. Fué él el que concertó el préstamo a nombre de su poderdante, el que otorgó el documento y el que recibió las rentas del verdadero dueño a quien concedió una prórroga vigente la cual ocurrió el incendió que destruyó casi en su totalidad la garantía.

Y no fueron sólo Sotomayor y su hija Mercedes y el propio dueño Solá quienes de modo detallado, amplio y persuasivo declararon sobre las circunstancias que mediaron en la transacción y que explican por qué los esposos Sotomayor aparecían como dueños de la casa hipotecada sin serlo y como deudores hipotecarios sin haber concertado la obligación ni lucrádose de ella, limitándose a entregar el importe del préstamo a Solá en el momento mismo de recibirlo de Jiménez, si que el propio notario Andrés Mena Latorre por ante quien se otorgó la escritura, declaró en los siguientes términos:

"P.—¿Sr. Mena, Ud. recuerda haber otorgado una escritura de hipoteca, esta escritura de hipoteca Núm. 39 entre don Ramón Sotomayor Maymí y don Fernando Jiménez como apoderado de don José P. Chandri?

"R.—Sí señor.

"P. ¿El día 30 de enero de 1933?

"R.—Sí señor.

"P.—¿Quién le habló, qué persona fué que le habló a Ud. y le pagó los honorarios de esa escritura?

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"R.—Don Juan Solá González.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"P. —Tenga la bondad de explicarme.

"R.—Don Juan Solá González estuvo en mi bufete por la mañana y me dice, 'tengo concertada una operación de préstamo con hipoteca con don Fernando Jiménez, sobre mi casa residencia.' Entonces yo le dije: 'bueno, pues tiene él que venir por aquí, él vendrá dos minutos por aquí', en efecto al poco rato estuvo don Fernando Jiménez y me dió las notas, me llevó la escritura.

"P.—¿Qué escritura le llevó?

"R.—Pues la escritura que estaba a nombre de don Ramón Sotomayor, yo le dije a don Fernando: 'bueno pero esta propiedad está a nombre de don Ramón Sotomayor', me dice: 'pero Ud. sabe que esa propiedad es de don Juan Solá González.'

   ※      ※      ※      ※      ※      ※      ※

"P.— . . . siga explicando.

"R.—Pues bueno, me facilitó, me dió las notas cómo había de hacerse la escritura de hipoteca, yo la hice y fuimos a firmarla.

"P.—Perdóneme un momento. ¿esa escritura que le entregó a Ud., era la escritura otorgada a favor de Sotomayor, o sea la que Sotomayor tenía en que aparecía Sotomayor ser dueño de la finca objeto de la hipoteca?

"R.—Sí señor, ser el dueño en efecto.

"P.—Siga.

"R.—Pues se hizo la escritura.

"P.—¿Las cláusulas de la escritura y las condiciones, quién se las dió a Ud.?

"R.—Don Fernando Jiménez, tiempo, intereses y seguro contra incendio, las condiciones de seguro contra incendio. Se hizo la escritura, fuimos a autorizarla a la casa de don Ramón Sotomayor.

"P.—¿Quiénes fueron a la casa de don Ramón Sotomayor?

"R.—Don Fernando Jiménez, don Juan Solá y el que habla, con los testigos, se leyó la escritura allí y antes de firmarla se expresó don Ramón Sotomayor: 'eso es de Ud., yo no tenga que ver nada con eso'.

"P.—¿A quién le decía eso?

"R.—A don Fernando Jiménez y a don Juan Solá González.

   ※      ※      ※    .  ※      ※      ※      ※

"P.—¿Quiere decir que Sotomayor le dijo a Solá que eso era de él?

"R.—Que eso era de él.

"P.—¿Y Jiménez le contestó, dijo algo?

"R.—No señor, no dijo nada.

"P.—¿Ud. estaba presente también cuando Jiménez entregó el cheque de que habla esa escritura ahí?

"R.—Sí señor, ese cheque se lo dieron a don Ramón Sotomayor y él no lo quiso, entonces le dijo: 'tiene que endosarlo', se endosó.

✳      ✳      ✳      ✳      ✳      ✳      ✳

"P.—¿Quién le dijo: 'tiene Ud. que endosarlo'?

"R.—Don Fernando Jiménez.

"P.—¿El mismo don Fernando Jiménez?

"R.—Sí señor.

"P.—¿Que hizo entonces don Fernando Jiménez con el cheque después de endosado?

"R.—Se lo entregó a don Juan Solá González que estaba allí presente."

Solemnes son las escrituras públicas, pero no por conservar incólume el principio debe quedar consagrado como verdadero lo que en realidad no lo es. Justas y tendentes a establecer el orden, a afirmar el crédito y a robustecer la confianza tan necesarios para el debido desarrollo de las sociedades, son los preceptos de ley invocados, pero esos mismos preceptos contienen excepciones cuyo alcance ha fijado la jurisprudencia a fin de permitir que la luz se haga cuando sea necesario impedir que operen en la realidad de modo injusto. Y en la excepción está este caso comprendido.

No deben alentarse las simulaciones. La verdad es el camino. La experiencia demuestra cuán caros se pagan los desvíos de esa ruta central que facilita y afianza todas las transacciones, pero muchas veces de buena fe, por una mal entendida bondad hacia familiares y amigos, por el deseo de poner a salvo intereses de personas débiles o por otros motivos más o menos explicables dentro de un campo de acción compatible en cierto modo con la honradez y la verdad última, se realizan actos simulados que no debe permitirse que tengan luego consecuencias tales que resulten opresivas. El castigo debe ser proporcionado a la falta y bastante castigo se recibe en esos casos con las incertidumbres y los trastornos de un pleito: Condenar a una restitución, que pudiera resultar ruinosa, de algo que se sabe que no se

recibió, resultaría injusto. De ahí la excepción, que, por supuesto, debe surgir de las alegaciones y de la evidencia, clara, robusta, plena, como surge en este caso.

■ No fué cometido en tal virtud el quinto de los errores señalados. En cuanto al sexto o sea que la fijación de quinientos dólares como honorarios de abogado además de las costas es excesiva, nos parece que tienen razón los apelantes atendidas todas las circunstancias concurrentes y siendo los demandantes los herederos—una viuda y dos hijos menores de edad. Creemos que trescientos dólares constituyen una compensación razonable.

*Debe modificarse la sentencia recurrida en tal sentido, y confirmarse, así modificada.*

El Juez Asociado Sr. Travieso no intervino.