RUBÉN D. REYES, demandante y recurrente, *v.* JUAN JUSINO DÍAZ y su esposa, LUZ C. NEGRÓN, demandados y recurridos.

*Número:* R-84-248 *Resuelto:* 3 de abril de 1985

*Ángel L. Tapia Flores,* de *Tapia & Avilés,* abogado de la parte recurrente; *Jesús M. Rivera Arvelo,* abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

A modo de prólogo en la solución de este recurso, cabe reproducir el siguiente pasaje que data de hace aproximadamente medio siglo:

> No deben alentarse las simulaciones. La verdad es el camino. La experiencia demuestra cuán caros se pagan los desvíos de esa ruta central que facilita y afianza todas las transacciones, pero muchas veces de buena fe, por una mal entendida bondad hacia familiares y amigos, por el deseo de poner a salvo intereses de personas débiles o por otros motivos más o menos explicables dentro de un campo de acción compatible en cierto modo con la honradez y la verdad última, se realizan actos simulados que no debe permitirse que tengan luego consecuencias tales que resulten opresivas. *Puig* v. *Sotomayor,* 55 D.P.R. 250, 260–261 (1939).

El drama forense tiene su génesis por la confrontación emergente de dos contratos existentes sobre el elemento del precio en una compraventa: uno público y otro privado. La sentencia recurrida dispuso de las controversias con todas las limitaciones inherentes que representaron las variadas posiciones dimanantes de uno u otro documento. Tal vez ello explica que no se siguiera una metodología clara de adjudicación. Ello ha dificultado desentrañar la verdad, esencia y propósito de nuestro sistema de justicia. Aún así, tras una larga y ardua jornada investigativa y reflexiva, hemos logrado su-

perar sustancialmente algunas de sus complejidades. Expongamos el trasfondo fáctico así depurado en esta etapa apelativa.

I

Mediante escritura pública núm. 21, denominada *Compraventa, Reconocimiento de Hipoteca y Constitución de Hipoteca*, otorgada ante la notario Gladys Iglesias Strong el 15 de mayo de 1975, Rubén D. Reyes y su esposa Gladys Aponte vendieron a los esposos, Juan Jusino Díaz y Luz C. Negrón, un inmueble y sus anejos situado en Río Piedras. Como precio de compraventa se hizo constar la cantidad de $61,000, a ser satisfechos mediante $14,000 entregados en el acto y el balance en virtud de un pagaré hipotecario al portador de $30,000. (Afidávit 7345.) Los vendedores extendieron otro pagaré por $17,000 a favor de los compradores para saldar en su día una hipoteca preexistente. (Afidávit 7346.) A modo de paréntesis, adviértase que el pago de estos $17,000 se acreditaron al comprador, a pesar de la incongruencia que arroja la extensión del pagaré a su favor.([1]) Sin embargo, ahí no terminó la transacción. Subsiguientemente, por documento denominado *Contrato Privado* (afidávit 7349) y sin comparecer la Sra. Gladys Aponte de Reyes, se consignó que "las partes desean aclarar que el precio verdadero de compraventa es noventa y cinco mil dólares ($95,000.00)". A tal efecto, los esposos Jusino-Negrón firmaron un pagaré (afidávit 7347) por $51,000 a favor de Reyes exclusivamente.

La firma de estos múltiples documentos configuró el siguiente negocio: Precio real de compraventa $95,000. Deducido el pronto pago de $14,000, su balance fue $81,000. Ello

---

([1])Esta deuda preexistente de $17,000, sobre la cual se extendió dicho pagaré por el vendedor al comprador, quedó explicada por la prueba. Jusino Díaz no tenía suficiente dinero para satisfacerla en ese momento. Se acordó que el vendedor Reyes la asumiría, reflejándose dicha cuantía en el precio total de venta de $95,000. En otras palabras, los $17,000 de la deuda preexistente serían cobrados por el vendedor en el precio total de venta.

queda explicado y evidenciado en virtud de la existencia de dos pagarés, uno por $51,000 y otro por $30,000. Sumados, coinciden matemáticamente con el remanente de $81,000. Se acordó que su pago sería a base de 234 mensualidades siguiendo una tabla de amortización, cuyo balance final, una vez acreditada una finca cedida por Jusino Díaz (valorada en $3,800) e incorporado el interés pactado de 8.5% anual, fue de $77,200. Dicha tabla de pagos desglosaba cada plazo mensual mediante la aplicación de una cuantía específica al principal —que lógicamente siempre será más baja— que la otra atribuida a los intereses. Todos estos documentos fueron simultáneamente autenticados ante la notario Iglesias Strong en la misma fecha.

Durante el período comprendido entre los años 1976 al 1978, sobrevinieron complicaciones contributivas relativas a una deuda de Reyes sobre dicho inmueble. El comprador Jusino Díaz se vio obligado a cumplir un plan de pago que Reyes había convenido con Hacienda. Así, pagó contribuciones adeudadas por Reyes para solucionar y evitar un trámite de apremio por Hacienda.

Posteriormente, Jusino Díaz incumplió algunos pagos de las mensualidades para amortiguar la deuda de compraventa acordada en el documento privado. Reyes lo demandó, reclamándole la suma de $14,115 como balance impagado del pagaré de $51,000. Jusino Díaz contestó y negó todas las alegaciones. Reconvino. Aunque admitió como precio de compraventa verdadero los $95,000 consignados en el documento privado, esgrimió la escritura pública de compraventa en apoyo de su reclamo al reembolso de las contribuciones mencionadas. Además, alegó poseer el pagaré vencido de $17,000 firmado a su favor por el demandante Reyes. Finalmente, reclamó $15,000 en daños y perjuicios por el "vicio" del inmueble consistente en la ocultación por el vendedor de la deuda contributiva y los inconvenientes que le ocasionó con el Departamento de Hacienda. Así las cosas, Reyes enmendó la deman-

da. Invocó la escritura pública y reclamó más de $25,000. También solicitó la ejecución de la hipoteca respecto al pagaré de $30,000. Jusino Díaz negó tales alegaciones. (²)

---

(²)Durante el proceso sobrevino a discusión la capacidad de Reyes para cobrar el pagaré hipotecario al portador de $30,000. Se suscitó, en vista de que su posesión la tenía, en calidad de prenda, su hermano Wilfredo Reyes, como garantía de pago a un préstamo de $15,000 que le hiciera. Durante la vista Wilfredo Reyes atestó no tener objeción al reclamo de su hermano contra Jusino Díaz. Después éste falleció.

Estimamos correcta la determinación del tribunal de instancia al requerir a Rubén Reyes que acreditara la tenencia del pagaré, lo cual no hizo. La mera comparecencia de su hermano Wilfredo Reyes y su aparente autorización a que procediera al cobro del mismo, cuando éste nunca fue parte en el pleito y retuvo dicho pagaré, es insuficiente para convalidar tal práctica. La protección del deudor contra ejecuciones posteriores por el tenedor del documento exige mayor cautela y menos informalidad. El requisito de tenencia, indispensable para el ejercicio y acción de cobro por la vía de apremio, no puede ser soslayado. Arts. 404, 426 y 427 del Código de Comercio de 1932, 19 L.P.R.A. secs. 91, 134 y 135. Véanse: B. Santiago Romero, *Tratado de Instrumentos Negociables*, 2da ed. rev., Río Piedras, Ed. Universitaria, 1981, págs. 95 y ss., 252 y ss.; *Caguas Co., Inc.* v. *Mombille*, 58 D.P.R. 300 (1941); *The National City Bank* v. *Sucn. Echevarría*, 50 D.P.R. 865 (1937).

La palabra castellana "prenda" se deriva del verbo latino *prehendere*, significa prender, asir, agarrar una cosa. *Ramos Mimoso* v. *Tribunal Superior*, 93 D.P.R. 551, 555 (1966). Mediante dicho contrato —de constitución formal— se transmite materialmente la cosa pignorada al acreedor, privándose el deudor de la *posesión de la misma*. J. M. Manresa, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1973, T. XII, págs. 583–584. Es cierto que en virtud del Art. 1768 del Código Civil, 31 L.P.R.A. sec. 5027, "[m]ientras no llegue el caso de ser expropiado de la cosa dada en prenda, *el deudor sigue siendo dueño de ella*". (Énfasis suplido.) Pero ello no significa que un pagaré hipotecario al *portador* dado en prenda no tenga unos efectos jurídicos. Art. 383 de la Ley de Instrumentos Negociables, 19 L.P.R.A. sec. 61. Como dijimos en *Vendrell* v. *Torres Aguiló*, 85 D.P.R. 873, 876–877 (1962), "[t]écnicamente de acuerdo con las disposiciones del Art. 1768, el dueño del pagaré lo era el que lo expidió, pero su mera entrega para garantizar una deuda lo había puesto en circulación, y había surgido a la vida del derecho un documento negociable con valor. Si no fuera así no tendría valor alguno para el que lo recibía en garantía y serían inútiles las disposiciones de ley que autorizan la expedición de pagarés al portador. . . . El contrato de dación en prenda de un pagaré hipotecario constituye un negocio jurídico, por la naturaleza del cual el acreedor prendario adquiere un interés especial en el pagaré". Cf. *Banco Central y Economías* v. *Registrador*, 111 D.P.R. 773, 780 (1981). Debe, pues, el recurrente Reyes para hacer efectivo su crédito adicionar como parte del pleito

Previa vista al efecto, el tribunal de instancia dictó sentencia. En esencia, decretó la nulidad del documento privado bajo la tesis de que fue hecho en fraude al Estado, específicamente al Departamento de Hacienda, por haberse hecho con el propósito de figurar un precio distinto y mayor al de la escritura pública y así evitar pagar más impuestos. Concluyó que el demandante Reyes fue quien provocó la nulidad. En virtud de ese análisis, estimó satisfecha y pagada en su totalidad la deuda de $61,000 que en su origen contrajo Jusino Díaz en la escritura pública. Se expresó así: "Dicha suma se concede como un pago de equidad y se reconoce como único acuerdo verdadero la escritura número 21, del 15 de mayo de 1975, que manifiesta el precio original de $61,000.00. El demandado ha pagado un total de $77,903.93, por lo que ha pagado en exceso al demandante la suma de $16,903.93. . . ." Como consecuencia, declaró con lugar la demanda y la reconvención interpuesta. Esto es, la demanda prevaleció en su reclamo hasta la suma de $61,000 consignada en escritura pública. Dedujo el tribunal la suma de $16,903.93 "pagada en exceso" por el comprador Jusino Díaz a base del monto de $77,903.93 pagado hasta esa fecha. En resumen, negó todo remedio al demandante Reyes y lo condenó a pagar a Jusino Díaz $16,903.93, las costas, más $2,000 de honorarios de abogado.

## II

Recientemente nos pronunciamos sobre una situación que implicó, en su dimensión contractual, serias violaciones de ley, que lesionaron la moral y el interés público. *Sánchez Rodríguez* v. *López Jiménez*, 116 D.P.R. 172 (1985). Resolvimos que la causa, como elemento indispensable en todo contrato, según el Art. 1227 del Código Civil, 31 L.P.R.A.

a los miembros de la sucesión del acreedor prendario, voluntaria o involuntariamente, promover algún acuerdo que le permita readquirir el pagaré o saldar la deuda que grava el pagaré.

sec. 3432, no puede oponerse a las leyes o a la moral, y que su enfoque no puede limitarse a la vertiente objetiva que visualiza sólo el contenido de las contraprestaciones objeto del contrato. Esto es, los motivos o móviles que indujeron a las partes a contratar son elementos extrajurídicos que en principio pueden ponderarse en la consideración de la ilicitud de la causa, "si lo aconsejan razones poderosas". Es menester advertir, sin embargo, que la modalidad jurídica que proyecta el trasfondo fáctico de autos está predicada en que "[l]a expresión de una causa falsa en los contratos dará lugar a la nulidad, si no se probase que estaban fundados en otra *verdadera y lícita*". (Énfasis suplido.) Art. 1228 del Código Civil, 31 L.P.R.A. sec. 3433. Ello, como consecuencia, entrelaza el contrato simulado con expresión de causa falsa con la causa ilícita, toda vez que la ocultación de la que deriva la simulación no puede responder en su contenido intrínseco a un propósito de violar o burlar la ley, o atentar contra la moral.

■ La simulación, sugiere la idea de ocultamiento o engaño (*ingannāre* = burlar, ocultar). F. De Castro y Bravo, *El Negocio Jurídico*, Madrid, Ed. Inst. Nac. Est. Jur., 1967, Sec. 116, pág. 338. Esto es, "[e]n el lenguaje común, *simular* significa hacer aparecer lo que no es, y *disimular* significa esconder lo que es. En el lenguaje jurídico, igualmente, simular significa fingir una realidad, y disimular significa lo contrario; en uno y otro concepto se halla ínsita la idea de un consciente operar con ficción u ocultación. Simulación en el negocio jurídico, en particular, se tiene cuando las partes, de acuerdo, realizan deliberadamente declaraciones distintas de la voluntad interna, con el fin de engañar a los terceros". L. Cariota Ferrara, *El Negocio Jurídico* (M. Albaladejo, traductor), Madrid, Ed. Aguilar, 1956, págs. 440-441. De donde se desprende, que en los contratos simulados los contratantes están completamente de acuerdo en producir una apariencia frente a terceros. Existe un acuerdo o propósito común para

simular. J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1978, T. II, Vol. 1, pág. 486.

▮ Estamos, pues, en el ámbito de la simulación relativa contractual. "Contrario a lo que ocurre en el supuesto de simulación absoluta, en que se pretende la configuración aparente de un acto ficticio o inexistente, en la modalidad relativa el negocio aparente encubre otro real que los contratantes desean sustraer a la curiosidad e indiscreción de terceros. De ahí que el negocio fingido o disimulado precise la existencia de una causa lícita." (Escolio omitido.) *Hernández Usera* v. *Srio. de Hacienda*, 86 D.P.R. 13, 18 (1962). Cuando la causa del contrato simulado es ilícita, éste es inexistente y no produce efectos jurídicos. *Sánchez Rodríguez* v. *López Jiménez*, supra; *Hernández Usera* v. *Srio. de Hacienda*, supra, pág. 18 n. 5. Véanse las siguientes Sentencias del T. S. de España: 20 de octubre de 1961, núm. 3607, Aranzadi, XXVIII Repertorio de Jurisprudencia 2353; 9 de diciembre de 1959, núm. 4492, Aranzadi, XXVI Repertorio de Jurisprudencia 2739; 7 de octubre de 1958, núm. 3406, Aranzadi, XXV Repertorio de Jurisprudencia 2233.

▮ Convenimos con De Castro y Bravo, *op. cit.*, pág. 350, en que "[l]a figura misma de la simulación relativa, depende de la respuesta que se haya de dar a la cuestión previa de si el negocio disimulado es indigno de protección jurídica". Se invocan varias razones:

. . . La simulación, como el dolo y el fraude, "nomina reatus", son artificios para defraudar la ley o los terceros, y por ello —se dice— en ningún caso merece protección jurídica. 2.a Los que simulan, son responsables de la simulación, por la que han de quedar vinculados por su propia mentira, y no les está permitido alegar entre sí la simulación, "ne propria detegatur turpitudo" (Graciano). 3.a Que, por el contrario, la simulación es lícita por sí misma, pues el "derecho de disimular así la verdadera situación no es más que la consecuencia del derecho reconocido de hacer actos secretos". 4.a Que

la simulación, por sí misma, no califica peyorativamente a lo simulado, pero se considera sospechoso el procedimiento, por lo que se suprime en su respecto la presunción de existencia y licitud de causa (sistema del Código civil, art. 1.276). (Escolios omitidos.) De Castro y Bravo, *op. cit.*, pág. 350.

▮▮▮ Nuestro ordenamiento jurídico, siguiendo la tradición española, ha optado por la vertiente de tolerar limitadamente los contratos simulados que disimulan una causa verdadera y lícita. Probada la simulación, el contrato simulado queda eliminado, para dar vigencia y efecto al verdadero y disimulado. Puig Brutau, *op. cit.*, págs. 490–491. Conviene precisar a tales efectos el alcance de la simulación cuando se expresa una causa falsa en los contratos. Primero, la simulación por sí misma no hace ilícito o nulo el negocio. Segundo, no obstante, se cierne sobre el negocio una mácula de sospecha. Tercero, una vez descubierta la simulación pierde vigencia la presunción de que la misma es lícita, y ya no recae sobre el deudor la carga de probar su existencia. Cuarto, se ha creado una presunción de simulación absoluta contra el negocio disimulado que compete al gestor rebatir mediante la existencia de una causa verdadera y lícita. De Castro y Bravo, *op. cit.*, pág. 352.

▮▮▮ Para prevenirse contra este resultado, surgió a la vida social y económica, un instrumento de importación francesa, del que las partes contratantes se servían en la protección de sus intereses frente al contrato simulado. Como medio de prueba fehaciente y eficaz se introdujo la modalidad del *contre-lettres*, contradocumento o contradeclaración. A. Rodríguez Adrados, *Escrituras, Contraescrituras y Terceros*, XXII Anales de la Academia Matritense del Notariado 229 *et seq.* (1978). En Francia, se denominó así en razón de que en su derecho antiguo el acto se llamaba *lettre*, por lo que en su acepción conceptual el primero alude al acto que contradice al otro acto. Así se incorporó esta figura al derecho civil con el nombre apuntado y se le subsumió como medio de

prueba en el capítulo que regula la prueba de las obligaciones. "Los documentos privados hechos para alterar lo pactado en escritura pública, no producen efecto contra tercero." Art. 1184 del Código Civil, 31 L.P.R.A. sec. 3285; L. Rodríguez-Arias, *En torno al negocio indirecto y figuras jurídicas afines*, 185 Rev. Gen. Leg. Jur. 276, 285 (1949); Puig Brutau, *op. cit.*, págs. 493–494; Q. M. Scaevola, *Código Civil*, 2da ed., Madrid, Ed. Reus, 1958, T. XX, págs. 424–427; De Castro y Bravo, *op. cit.*, págs. 366–368; J. M. Manresa, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1967, T. VIII, Vol. 2, págs. 149–152; F. Ferrara, *La Simulación de los Negocios Jurídicos* (R. Atard y J. A. De la Puente, traductores), Madrid, Ed. Rev. Der. Privado, 1953, pág. 368 y ss.

La doctrina también discute la dificultad que entraña la simulación cuando recae sobre uno de los elementos del negocio, a saber, fecha, precio o identidad de los sujetos. De Castro y Bravo, *op. cit.*, pág. 441; F. Ferrara, *op. cit.*, pág. 247 y ss.

### III

 El caso que nos ocupa se refiere específicamente al precio falso o cuyo monto real se oculta. En la compraventa uno de los contratantes se obliga a entregar una cosa determinada y el otro a pagar por ella un *precio cierto* en dinero o signo que lo represente. Art. 1334 del Código Civil, 31 L.P.R.A. sec. 3741. Precio verdadero quiere decir precio existente, precio real y efectivo. Por ello, el precio es el elemento más característico de la compraventa. Esta exigencia responde a la necesidad de que el precio ineludiblemente exista, de lo contrario la venta sería simulada. J. M. Manresa, *op. cit.*, 1969, T. X, Vol. 1, pág. 77 y ss.; Puig Brutau, *op. cit.*, 1956, T. II, Vol. 2, pág. 145; Scaevola, *op. cit.*, 1970, T. XXIII, Vol. 1, pág. 487 y ss.; J. Castán Tobeñas, *Derecho civil español común y foral*, 11ra ed. rev., Madrid, Ed. Reus, 1981, T. IV, pág. 87 y ss.; L. Díez-Picazo y A. Gullón, *Sistema de*

*Derecho Civil*, 3ra ed., Madrid, Ed. Tecnos, 1982, Vol. II, pág. 323 y ss.; J. Santos Briz, *Derecho Civil Teoría y Práctica*, Madrid, Ed. Rev. Der. Privado, 1973, T. IV, pág. 57 y ss.

Confrontado con dicho problema, la tendencia jurisprudencial española, apunta hacia la convalidación del negocio que recoge el contradocumento donde se expresa el precio verdadero. Ese enfoque no ha pasado por alto que la pretensión de las partes en muchas instancias se dirige a evadir el pago de contribuciones al Estado. El nivel de "tolerancia" en España a este tipo de práctica ha llevado al Tribunal Supremo a referir al Ministerio de Hacienda para la corrección contributiva correspondiente y sanciones legales a las partes. Se destaca así como motivo preeminente que inspira la simulación, el fin de engañar a la ley civil o tributaria; se trata de evadir el pago de elevados derechos de registro mediante esta práctica de la contradeclaración. Preocupa a la doctrina el nivel moral que trasluce este tipo de negocio. La línea divisoria que separa los contratos simulados cuyo efecto es engañar al fisco, de la llamada "simulación fraudulenta" es tenue por demás. Aún así, se estima que no deben quedar comprendidos los primeros en dicho grupo. Ello, motivado por la pena severa que conlleva el negocio en fraude a la ley y que hace inexistente el negocio jurídico. F. Cordón Moreno, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1981, T. XVI, Vol. 2, págs. 201–202; Manresa, *op. cit.*, 1967, T. VIII, Vol. 2, págs. 149–152; H., L. Mazeaud y J. Mazeaud, *Lecciones de Derecho Civil* (L. Alcalá-Zamora, traductor), Buenos Aires, Eds. Jurídicas Europa-América, 1960, Vol. I, pág. 319 y ss.; F. Ferrara, *op. cit.*, pág. 443 y ss.; Cariota Ferrara, *op. cit.*, págs. 442–443; Scaevola, *op. cit.*, pág. 425; R. Badenes Gasset, *El Contrato de Compraventa*, Madrid, Ed. Tecnos, 1969, T. I, págs. 178–179; R. Luzzatto, *La Compraventa* (F. Bonet Ramón, traductor), Madrid, Ed. Reus, 1953, pág. 70 y ss.; Rodríguez Arias, *op. cit.*, pág. 284.

Véanse también: Sentencias del T. S. Español de 11 de mayo de 1965, núm. 2534, Aranzadi, XXXII Repertorio de Jurisprudencia 1537; de 2 de diciembre de 1941, núm. 1402, Aranzadi, VIII Repertorio de Jurisprudencia 847, y la de 21 de junio de 1927, núm. 168, 175 Juris. Civil 866.

■ De otra parte, nótese que los actos efectuados en contravención de la ley son nulos. Art. 4 del Código Civil, 31 L.P.R.A. sec. 4; *Rubio Sacarello* v. *Roig*, 84 D.P.R. 344, 350–353 (1962); *Guzmán* v. *Guzmán*, 78 D.P.R. 673, 677–678 (1955); *Corporación Azucarera* v. *Junta Azucarera*, 77 D.P.R. 397, 409–410 (1954); *Sánchez* v. *Coll*, 69 D.P.R. 925, 928–929 (1949). Debemos insistir, no obstante, en que la doctrina se muestra receptiva y comprensiva ante la motivación que inspira este tipo de conducta.

Gran profundidad reviste el pensamiento de F. Ferrara, *op. cit.*, pág. 248, quien con mayor amplitud ha estudiado el problema:

> En éste, como en otros casos, en que se disfraza la naturaleza del contrato para defraudar a la Administración en sus derechos fiscales, existe ciertamente una simulación *contra legem;* pero no por ello debe creerse que el contrato haya de ser nulo. Tuvimos ya ocasión de decir que, al quitar su disfraz al negocio, debe aplicarse a éste la sanción, cualquiera que sea, que hubiera debido aplicársele si se hubiera celebrado manifiestamente. Es sabido que no tod[a]s las leyes prohibitivas tienen el mismo alcance, pues mientras unas se inspiran en un interés muy general, otras protegen un interés más limitado, y otras finalmente, obedecen a meras finalidades de disciplina, financieras o de policía; y así, según la importancia de la prohibición, las sanciones serán unas u otras. La transgresión de las leyes de orden público produce la nulidad total del acto; la de las leyes de la segunda clase, una mera anulabilidad, y la de las últimas, una pena para el autor. En el tercer grupo figuran precisamente las leyes financieras, que establecen el pago de un impuesto a favor del Estado, según la naturaleza del acto, y al eludir sus normas se comete una *contravención* castigada con una simple *multa*.

En igual sentido Cariota Ferrara, *op. cit.*, pág. 443, comenta:

> . . . Se quiere hablar, para los últimos supuestos de hecho, en los que el engaño se dirige a los acreedores, al fisco o a la ley, de *simulación fraudulenta*: el concepto es impropio, pues la simulación solamente es simulación y no se deja calificar, y el fraude puede ser sólo el fin concreto que induce a simular y que se encuentra fuera de la simulación. Por lo demás, el negocio simulado, en cuanto no es querido en su contenido ni en su resultado, no puede realizar el fraude, sino sólo servir de instrumento con el que crear aquella situación aparente que, engañando a los terceros, lo hace prácticamente posible.

Frente a esta postura, Rodríguez Arias, *op. cit.*, pág. 285, encara el problema con mayor severidad:

> . . . Dicho acto puede emplearse como medio para defraudar a los terceros o eludir las exigencias del fisco, mientras otras veces, según queda ya indicado, se entra dentro del marco de la licitud, cuando a los contratantes no les mueve otro deseo que el de no poner al público al corriente de negocios privados evitando así indiscreciones.

Nuestro ordenamiento jurídico ya se enfrentó, aunque limitadamente, con ese problema jurídico. Por su importancia en la resolución de este caso, reproducimos a continuación nuestra expresión judicial:

> La regla general, indudablemente, es que un contrato otorgado en violación de la ley es una nulidad y que los contratantes no pueden exigir el cumplimiento del mismo. Artículo 4, Código Civil, ed. 1930; *Embry* v. *Jemison,* 131 U.S. 336, 33 L. ed. 172, 177. *Empero, si bien es cierto que en este caso la prueba demuestra que se hizo constar en la escritura una suma menor que aquélla que en realidad servía de causa al contrato, no puede decirse por ese solo hecho que dicha causa fuera ilegal y, por ende, que el contrato sea nulo, Latorre* v. *Cruz, 67 D.P.R. 743; Ríos* v. *Amorós, et al., 27 D.P.R. 804. Cf. González Rodríguez* v. *Fumero, 38 D.P.R. 556.* Al fijarse una suma menor como causa, el propósito fué

tratar de lograr que la propiedad se tasara más tarde por el Tesorero de Puerto Rico en una suma que diera derecho a los adquirentes a disfrutar de la exención provista por el artículo 291 del Código Político, según el mismo fué enmendado por la Ley núm. 27 de 12 de abril de 1941 (pág. 457). (Al tasar propiedades el Tesorero hace naturalmente su propia valoración de las mismas y el precio estipulado por las partes en una escritura no es, en manera alguna, obligatorio ni decisivo para dicho funcionario.) Al así procederse se violó también la sección 2 de la Ley núm. 101 de 12 de mayo de 1943 (pág. 279), que especifica los sellos de rentas internas a ser cancelados en los originales y copias. (Énfasis suplido.) *Sánchez* v. *Coll,* supra, pág. 928. Véanse *Quiñones Quiñones* v. *Quiñones Irizarry,* **91 D.P.R. 225, 299** (1964) ; *Sánchez Rodríguez* v. *López Jiménez,* supra.

## IV

■ Bajo el crisol de este marco doctrinario, resolvemos que el *Contrato Privado*, como contraescritura, no es nulo. Éste es el único significado y solución que podemos alcanzar a tono con el texto y espíritu del Art. 1184 del Código Civil, sobre el alcance de documentos privados que pretenden desvirtuar lo pactado en escrituras públicas. En lo concerniente a Rubén Reyes y los esposos Jusino-Negrón es válido. Por ende, como precio real y cierto de la compraventa, la suma de $95,000 convenida debe prevalecer. Entre la colisión dimanante del precio figurado en la escritura pública y el del referido documento privado, la diferencia refiere sólo a su cuantía. No detectamos que esa disimilitud desnaturalice el hecho cierto y no contradicho de que medió una causa válida entre las partes. En ese sentido erró el foro de instancia al decretar la nulidad del documento privado para dar vigencia únicamente al precio en la escritura pública.

Como corolario decisorio, tiene razón el recurrente Reyes en su argumentación de los errores tercero, cuarto y quinto, en torno a las cuantías.

Según el foro de instancia, la partida de $77,903.93 fue

resultado del siguiente desglose. La suma de $14,000 en efectivo pagados en el acto de otorgamiento de la escritura, que incluye además, con apoyo en la prueba testifical, una finca valorada en $3,800 que Jusino Díaz cedió en abono a la deuda. A base de los recibos de pago presentados en evidencia por el comprador, el tribunal estimó que éste pagó $24,550 en mensualidades. A su vez, éste consignó judicialmente $6,910 en pago de mensualidades atrasadas. Concluyó que el comprador Jusino Díaz además satisfizo una deuda de $21,079.93 preexistente a la compraventa y que gravaba el inmueble en cuestión. Finalmente, le acreditó el pago de $7,564, en concepto de contribuciones debidas por el demandante Reyes al Departamento de Hacienda. Ello totalizó la suma global acreditada de $77,903.93, deducida literal y estrictamente por dicho foro del precio real de venta, a saber, $95,000 bajo la hipótesis de que el documento privado hubiese prevalecido.

Es errónea esta determinación del tribunal. Parte de la premisa equivocada de negarle efectividad al documento privado entre las partes.

█ La ausencia de una relación específica y explicada de las cuantías y sumas en controversia ha contribuido y plagado el récord de dudas en cuanto a la corrección del cómputo final. Han sido infructuosos nuestros esfuerzos para superar este escollo en esta etapa apelativa. Nos obliga a que sea inconcluso nuestro dictamen y a devolverlo para la precisión y *corrección de las partidas enumeradas, a base de las guías aquí esbozadas.* (³) En la compartida e indivisible encomienda

---

(³)Primeramente, con sujeción a que el recurrente Reyes corrija la deficiencia anteriormente apuntada, basada en la falta de posesión del pagaré de $30,000, y satisfechas las interrogantes de unos pagos efectuados por Jusino Díaz, debe partirse del balance aplazado de $77,200 y la tabla de pagos.

Así, el tribunal, atendiendo la fecha y número de cada pago, adjudicará cuánto corresponde al principal y a los intereses. Este examen se impone, pues la cuantía que determinó como pagada en plazos mensuales, a saber, $24,550 es errónea en tanto no distingue la suma atribuible al principal de las de los intereses. Tampoco los intereses por mora, si algunos.

de lograr la verdad y administrar cumplida justicia, confiamos en la máxima colaboración de los abogados de las partes, como funcionarios auxiliares del tribunal. *Berríos* v. *U.P.R.*, 116 D.P.R. 88 (1985).

## V

Al arribar a las anteriores conclusiones, no se nos escapa la presunción arrojada por las circunstancias en que fue redactado el *Contrato Privado*. Todos los indicadores apuntan hacia la conclusión de que se hizo así con el propósito de minimizar el pago de obligaciones fiscales en varias dimensiones. Primero, conllevaba un impacto reductor contributivo para fines del cómputo de ingreso neto en la determinación del

---

A su vez, la cantidad que estimó pagada en contribuciones directamente por el comprador Jusino Díaz a Hacienda —que debieron pagarse por el vendedor Reyes— adolece de otras fallas. Tiene el tribunal que precisar si la totalidad de los $7,654 pertenecen a una deuda contributiva anterior a la compraventa del 15 de mayo de 1975. Notamos que se incluyen contribuciones con fecha posterior a la compraventa que, si bien podrían corresponder a la deuda aplazada anterior, también podrían ser atribuibles al comprador desde que adquirió el título del inmueble. La cantidad correcta, pagada por Jusino Díaz a Hacienda, incluyendo sus intereses, debe descontarse netamente del balance del principal existente.

Por otro lado, si indubitadamente Jusino Díaz pagó los $21,079.93 en el pleito de ejecución de hipoteca que por la suma original de $17,000 Reyes le extendió un pagaré, entonces procedería también descontarlos netamente del balance del principal existente a la fecha en que realizó ese pago.

Con relación a los $6,910 consignados por Jusino Díaz en el tribunal en concepto de pago de mensualidades atrasadas, debe dicho foro verificar cuánto el demandante Reyes pudo legítimamente retirar y si esa totalidad consignada incluyó algún cheque que hubiese sido anteriormente sumado en la partida de contribuciones o en el balance de pagos mensuales.

*El examen y precisión de estos pagos conllevará una modificación de la tabla de amortización acordada.* En otras palabras, los pagos de Jusino Díaz a ser acreditados en las fechas correspondientes, reducirán el principal netamente y los intereses generados, y por ende, la distribución originalmente contemplada.

En cuanto al destino y resultancia de la reconvención en daños y perjuicios, desconocemos qué remedios fueron concedidos, si algunos, y qué cuantía, si alguna, pudo haberse otorgado finalmente. También si procede o no una reformulación al respecto. Otra vez corresponderá al tribunal de instancia esclarecerlo.

monto y reconocimiento de ganancias o pérdidas por la venta u otra disposición de propiedad inmueble acorde la Ley Núm. 91 de 29 de junio de 1954, según enmendada, 13 L.P.R.A. secs. 3111–3114. También a través del precio simulado, se lograban bajar las cuantías a pagarse por sellos de Rentas Internas, no sólo en el acto de la escritura sino en los derechos de presentación en el Registro de la Propiedad.

■ Estas posibles infracciones al erario público no deben quedar al descubierto. Fácil es concebir como tercero al Estado Libre Asociado y sus dependencias afectadas en sus funciones rectoras de velar por el fiel cumplimiento de las leyes tributarias en todas sus dimensiones. El remedio es remitir el asunto al Departamento de Hacienda para el trámite que estime procedente. Véanse: *Pérez Cruz* v. *Hosp. La Concepción*, 115 D.P.R. 721 (1984); *Quintana Tirado* v. *Longoria*, 112 D.P.R. 276, 286 n. 8 (1982); *Suro* v. *E.L.A.*, 111 D.P.R. 456, 460 (1981).

Para ultimar, no podemos, pasar por alto la posible lesión que ha habido a las normas de excelencia que conlleva la práctica de la notaría, por las actuaciones de la notario Gladys Iglesias Strong. *In re Vélez*, 103 D.P.R. 590 (1975). En esta etapa no corresponde pronunciarnos específicamente. En nuestra indelegable función de contribuir al máximo enaltecimiento de la gestión notarial, debemos ordenar que copia de la presente decisión sea también remitida a la Oficina del Procurador General de Puerto Rico para la acción correspondiente. (⁴)

Por los fundamentos expuestos, *se dictará sentencia que revoque la del Tribunal Superior, Sala de San Juan, fechada 4 de abril de 1984. Se decreta válido, ínter partes, el Con-*

---

(⁴) Desconocemos si la notario Iglesias Strong al remitir copia de la escritura núm. 21 al Secretario de Hacienda, conforme lo requiere la Ley Notarial, 4 L.P.R.A. sec. 1006, acompañó también copia del contrato privado que según las partes y su autenticación era el que consignaba el precio real y verdadero.

*trato Privado. Se devolverá el caso al tribunal de instancia para la continuación de los procedimientos compatibles con lo resuelto.*