# 2002 DTA 138

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL VII DE CAROLINA Y FAJARDO

JOSE MATOS MATOS, CARMEN LUZ BORGES Y
LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS
Demandantes-Apelantes

v.

EDUARDO MIRANDA FRANCO Y OTROS
Demandados-Apelados

AXEL ORTIZ COLON
Interventor-Apelado

Núm. KLAN-01-01010

San Juan, Puerto Rico, a 10 de septiembre de 2002

Panel integrado por su Presidente, el Juez Miranda De Hostos,
la Juez Hernández Torres y el Juez Martínez Torres

Martínez Torres, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Apelan ante nos los demandantes, José Matos Matos, Carmen Luz Borges y la sociedad legal de bienes gananciales compuesta por ellos. Solicitan que revoquemos una sentencia dictada el 9 de agosto de 2001 por el Tribunal de Primera Instancia, Sala Superior de Carolina (Hon. Wilfredo Padilla Soto, Juez). En la referida sentencia, el tribunal decretó nulas e ineficaces ciertas escrituras de compraventa y de constitución de hipoteca; ordenó al Registrador de la Propiedad que procediera a cancelar en sus libros las inscripciones y asientos correspondientes a dichas escrituras; declaró nulo e ineficaz un pagaré hipotecario al portador y declaró con lugar la reconvención del interventor Axel Ortiz Colón contra los aquí demandantes-apelantes, Matos Matos y otros. También se les impuso el pago de los gastos y costas del litigio, además de $10,000.00 por concepto de honorarios de abogado por temeridad. Por los fundamentos que expondremos a continuación, se confirma la sentencia apelada.

### I

El 12 de junio de 1995, José A. Matos Matos, Carmen Luz Borges y la sociedad legal de bienes gananciales compuesta por ambos, radicaron una demanda sobre ejecución de hipoteca por la vía ordinaria contra Eduardo Miranda Franco. Alegaron, en síntesis, que Miranda Franco, por valor recibido, suscribió el 9 de marzo de 1993 un pagaré por la suma principal de $296,250.00 más intereses al 9.75% anual, vencedero el 9 de marzo de 1994. Expusieron que ese hecho consta según la Escritura Número 17 otorgada el 9 de marzo de 1993, ante el Notario Público José González González.

En segundo lugar, los demandantes-apelantes, Matos Matos y otros, alegaron que en aseguramiento del referido pagaré, el demandado-apelado, Miranda Franco, otorgó hipoteca voluntaria sobre un inmueble localizado en la Urbanización Jardines de Country Club, inscrito al Folio 41 del Tomo 828 del Registro de la Propiedad en Carolina, Sección Primera, Finca Número 39026.

Se alegó también en la demanda que el codemandante-apelante, Matos Matos, es tenedor de buena fe y por valor recibido, del antes mencionado pagaré. Por último, se alegó que el demandado-apelado, Miranda Franco, no había satisfecho el pago del principal ni de sus intereses a la fecha de vencimiento, por lo que se declaró vencida la totalidad de la deuda. Como consecuencia de ello, se solicitó al tribunal la venta de la propiedad en pública subasta para satisfacer el monto de la reclamación, además de la concesión de todas las costas, gastos del procedimiento y el pago de honorarios de abogado.

El 28 de diciembre de 1995, el aquí demandado-apelado, Miranda Franco, contestó la demanda y negó todas las alegaciones contenidas en la misma. Entre sus defensas afirmativas, Miranda Franco alegó que el pagaré en controversia carece de causa, es nulo y su otorgamiento fue obtenido mediante fraude o dolo, o ilegalmente.

A principios del año 1996, el codemandante-apelante, Matos Matos, radicó una moción de sentencia sumaria a la cual se opuso el demandado-apelado, Miranda Franco. El 30 de enero de 1997, el tribunal declaró sin lugar la referida moción por entender que desde la contestación a la demanda existían controversias que debían dirimirse.

En marzo de 1997, Axel Ortiz Colón presentó una moción solicitando intervención en el pleito. Alegó en dicha moción que es el verdadero dueño de la propiedad inmueble que garantiza el pagaré y que el mismo se otorgó mediante fraude utilizando un negocio simulado.

El 14 de octubre de 1997, el interventor Ortiz Colón contestó la demanda y negó todas las alegaciones contenidas en la misma. Dentro de sus defensas afirmativas, alegó la nulidad del pagaré en controversia. También radicó una reconvención en la cual alegó que los aquí demandantes-apelantes *"se prestaron para cometer fraude o dolo contra el referido interventor, causándole a éste grandes angustias mentales ante la posibilidad o temor de quedarse en la ruina económica, ya que la garantía real correspondiente a la hipoteca que se quiere ejecutar en este caso"* es propiedad suya. Por lo tanto, el interventor Ortiz Colón solicitó al tribunal que declarara la nulidad *"ab initio"* de los contratos de préstamo e hipoteca en controversia; el pago por los aquí demandantes-apelantes de $100,000.00 por concepto de daños y perjuicios, entre otros remedios.

En octubre de 1997, el interventor Ortiz Colón radicó una *"demanda del interventor contra terceros"*. Dichos terceros son: Santurce Mortgage, Raúl Monteagudo, Juana Doe y la sociedad legal de gananciales compuesta por ambos, el Notario José González González, Fulana de Tal y la sociedad legal de gananciales compuesta por estos últimos. Ortiz Colón solicitó, entre otras cosas, que los terceros demandados le paguen $400,000.00 por concepto de daños y perjuicios correspondientes a las angustias mentales alegadamente sufridas.

Por otro lado, el 24 de agosto de 1998, el Tribunal de Primera Instancia declaró con lugar la moción de sentencia sumaria presentada por el Notario José González González. El tribunal fundamentó su determinación en que la demanda contra él se encontraba prescrita, conforme la doctrina referente a la responsabilidad civil del notario.

Posteriormente, el tribunal desestimó la demanda del interventor contra los terceros Santurce Mortgage Brokers, Raúl Monteagudo, Juana Doe y la sociedad legal de gananciales compuesta por ambos. Se fundamentó la desestimación en que estos terceros nunca fueron emplazados.

El 7 de julio de 2000, los demandantes-apelantes, Matos Matos y otros, presentaron una moción solicitando sentencia sumaria parcial. Dicha moción se declaró sin lugar el 11 de julio de ese mismo año. La vista en su fondo se llevó a cabo durante los días 1 y 21 de agosto, y 18 de septiembre de 2000. Luego de admitir como exhibit la documentación presentada por las partes, y luego de escuchar las declaraciones de los testigos Lcdo. Angel L. Tapia Flores, el codemandante-apelante Matos Matos, ■ el interventor Ortiz Colón, la Sra. Gladys Negrón Cordero y el Sr. Jorge L. Morales García, el foro de primera instancia realizó las siguientes determinaciones de hechos:

*"1. A principios del año 1991, el interventor Axel Ortiz Colón, era el arrendatario de la propiedad que se describe a continuación:*

*Urbana: Solar marcado con los números uno, dos, y diez del bloque BM de la Urbanización Jardines de Country Club, localizado en el Barrio Sabana Abajo del término municipal de Carolina, con un área superficial de Mil Doscientos Cinco Metros con veintidós centímetros (1,204.22)■ cuadrados, en lindes por el Norte, en*

*dos alineaciones, una de quince metros con cincuenta centímetros (15.50 m.c) con el solar número trece (13) y otra, también de quince metros con cincuenta centímetros (15.00 m.c) con el solar número nueve (9) del mismo bloque; por el Sur en diecinueve metros (19.00 m.) con la calle número ciento veintidós (122); por el Este, en dos alineaciones una de treinta metros con cincuenta centímetros (30.50 m.c) con la calle número ciento veinte (120) y el solar número nueve (9) del mismo bloque; y la otra de veintidós metros con veinticinco centímetros (22.25 m. c.) con el solar número tres (3) del mismo bloque; por el Oeste, en cuarenta y cinco metros con cincuenta centímetros (45.50 m.c.) con la Avenida Galicia, y por el Suroeste, en dieciocho metros con ochenta y cinco centímetros (18.85 m.c) con la intersección de la Avenida Galicia y la calle número ciento veintidós (122). Consta inscrita al folio número cuarenta y uno (41), del tomo ochocientos veintiocho (828)█ del Registro de la Propiedad de Carolina, Sección Primera, finca número Treinta y nueve mil veintiséis (39,026).*

*2. El Lcdo. Angel L. Tapia Flores y otras personas eran los dueños de la referida propiedad. Estos se la alquilaron al interventor en el año 1986, mediante Contrato de Arrendamiento, con opción a compra, por un término de cinco (5) años. De ejercitarse la opción de compra, se pacto [sic] como precio de compraventa, la cantidad de doscientos mil dólares (200,000).*

*3. A principios del año 1991, el interventor decidió ejercitar la opción de compra del referido inmueble. Con el propósito de conseguir financiamiento, el interventor visitó las oficinas del Sr. Raúl Monteagudo González h/n/ c Santurce Mortgage Broker, quien para esa época se dedicaba al negocio de intermediario de préstamos hipotecarios sobre propiedad inmueble.*

*4. El Sr. Raúl Monteagudo González le requirió al interventor, que para poder conseguirle el financiamiento y llevarse a cabo el otorgamiento de la escritura de compraventa, tenía que llevarle a el y/o Santurce Mortgage la cantidad de veinticinco mil (25,000.00) dólares, los cuales cubrirían un pago inicial y los gastos de cierre.*

*5. El interventor cumplió con lo requerido, y el 16 de agosto de 1991 se reunió con el Lcdo. Angel L. Tapia Flores y los otros dueños de la propiedad mencionada, en las oficinas de Santurce Mortgage Brokers, con el propósito de llevar a cabo el otorgamiento de la escritura de compraventa por la cantidad de doscientos mil dólares (200,000.00).*

*6. El 16 de agosto de 1991, el interventor Alex Ortiz Colon [sic], adquirió la referida propiedad mediante la Escritura de Compraventa Número 59, otorgada por el Notario Daniel Pernas Beceiro. Ese día se le entrego[sic] al Lcdo. Angel L. Tapia Flores la cantidad de $25,000.00 -que el interventor le entrego[sic] al Sr. Raúl Monteagudo González y la cantidad de $175,000.00 de parte del Sr. Monteagudo González.*

*7. Ese mismo día también, el Sr. Monteagudo González le indica al interventor que la cantidad de pago y gastos de cierre ascendían a la cantidad de $37,000.00, por lo cual el total del préstamo por financiamiento sería de doscientos doce mil dólares (212,000.00), esto es $175,000 + $37,000.00.*

*8. A base de lo informado, ese mismo día, el interventor suscribió tres (3) pagarés hipotecarios al portador. De los cuales dos (2) eran por valor principal de $100,000.00 cada uno, y el otro por valor principal de $12,000.00. Todos los pagares [sic] suscritos eran con vencimiento de un (1) año.*

*9. Dichos pagares [sic] hipotecarios están evidenciados con las escrituras número 61, 62 y 63 otorgados por el Notario Daniel Pernas Beceiro.*

*10. Contando a partir de agosto de 1991, durante más de año y medio, el interventor le pago [sic] al Sr. Monteagudo González y/o Santurce Mortgage Broker, o su representante, la suma promedio de aproximadamente $1,800.00 por concepto de supuestos intereses.*

11. *Pasado el tiempo, el Sr. Monteagudo González le indicó al Sr. Axel Ortiz (el interventor) que no cualificaba para el préstamo de financiamiento, y que tendría que conseguir otra persona para que facilitara la obtención del financiamiento necesario.*

12. *El demandado Eduardo Miranda fue la persona que el interventor (Axel Ortiz) consiguió para obtener el financiamiento. Ambos fueron a las oficinas de Santurce Mortgage Broker, para cualificar al primero (demandado).*

13. *El 9 de marzo de 1993 se otorgo [sic] la Escritura de Compraventa de la propiedad antes descrita, la número 16, otorgada por el Notario José González González, figurando como vendedor el Sr. Alex Ortiz, el interventor, y como comprador el demandado, el Sr. Eduardo Miranda. El precio de compraventa reflejado en la escritura fue de $350,000.*

14. *La antes referida transacción es una simulada, ya que el supuesto vendedor, es decir, el Sr. Alex Ortiz Colon [sic] no recibió cantidad alguna por concepto de la venta, y el supuesto comprador no hizo entrega de cantidad alguna de dinero, con el propósito de adquirir la propiedad, ni ha estado nunca en posesión de la misma, ni ha realizado acto alguno de dominio. De hecho, el interventor Sr. Alex Ortiz, ha estado sin interrupción en posesión de la propiedad, operando la misma un negocio de reparación de acondicionadores de aire para vehículos de motor conocido como El Polo Norte.*

15. *Ese día, el 9 de marzo de 1993, el Sr. Monteagudo González, le informó al Sr. Alex Ortiz Colon [sic], que los gastos de cierre de la nueva transacción ascendían a la suma de $84,250.00, razón por la cual esta cantidad se añadiría a la cantidad del precio inicial de $212,000.00, llevando el monto del nuevo préstamo a $296,000.00.*

16. *También ese día, 9 de marzo de 1993, se otorgó un pagaré hipotecario al portador por valor principal de $296, 250.00, con vencimiento en tres (3) años, suscrito por el Sr. Eduardo Miranda Franco, el 9 de marzo de 1993, notarizado por el Notario José González González, según affidávit número 6512, y la correspondiente Escritura de Constitución de Hipoteca, la Número 17, otorgada por el Notario José González González. Dicho pagaré hipotecario quedó en posesión del Sr. Monteagudo González.*

17. *En el otorgamiento de la referida escritura 17, igual que en la escritura número 16 antes mencionada, no hubo entrega alguna de dinero al Sr. Alex Ortiz Colón, ni al Sr. Eduardo Miranda Franco. Ninguna persona natural jurídica le prestó dinero al demandado, Sr. Eduardo Miranda Franco para adquirir la antes descrita propiedad.*

18. *Luego del otorgamiento de las mencionadas escrituras 16 y 17, el interventor Sr. Alex Ortiz Colon [sic], le pagó intereses al Sr. Monteagudo h/n/c Santurce Mortgage Brokers, la cantidad mensual promedio de $2,047.00 por concepto de intereses.*

19. *El 14 de julio de 1993, se otorgaron ante el Notario José González González, tres (3) Escrituras de Cancelación de Hipoteca, las número 52, 53, 54, las cuales cancelaron y/o anularon los tres (3) pagarés hipotecarios al portador, antes mencionados, otorgadas el 16 de agosto de 1991, dos (2) por valor principal de $100,000.00 c/u y uno por valor de $12,000.00.* ▮ *Las escrituras 52, 53 y 54 nunca fueron presentadas al Registro de la propiedad para la correspondiente cancelación.*

20. *Durante aproximadamente dos (2) años y medio (2½), el Sr. Jorge L. Morales García, empleado, cobrador y representante de Santurce Mortgage Broker, fue la persona que recibía los pagos mensuales que hacía el interventor Sr. Alex Ortiz Colón, por pagos de intereses del referido pagare [sic] por valor principal de $296,250.00*

21. Los pagos regularmente se realizaban al Sr. Morales García, en el negocio conocido por El Polo Norte, propiedad del interventor y localizado en el inmueble que antes hemos descrito. Allí en el negocio el Polo Norte quien efectuaba los pagos era la Sra. Gladys Negreen [sic] Cordero, gerente del negocio. Dichos pagos se efectuaban tanto en efectivo como en cheque del negocio Polo Norte o del interventor Sr. Alex Ortiz.

22. Ni el Sr. Monteagudo ni Santurce Mortgage Brokers, nunca le entregaron al interventor, ni al demandado libreta formal de pago alguna para pagar las mensualidades correspondientes al supuesto préstamo hipotecario. Para evidenciar los pagos que realizaban el interventor Sr. Alex Ortiz, el Sr. García expedía recibo de pago a favor del demandado Eduardo Miranda Franco. Esto por instrucciones del Sr. Monteagudo González.

23. Santurce Mortgage Brokers y/o Santurce Mortgage Brokers Corporation y/o el Sr. Monteagudo González, nunca le consiguió al interventor ni al demandado financiamiento alguno con una institución financiera debidamente autorizada a hacer negocios de préstamos hipotecarios.

24. Santurce Mortgage Brokers y/o Santurce Mortgage Brokers Corporation y/o el Sr. Monteagudo González, sólo ha sido autorizado a operar como corredor de hipotecas, pero nunca han estado autorizados a otorgar préstamos hipotecarios de sus propios recursos, por la Oficina del Comisionado de Instituciones Financieras, agencia gubernamental que regula a las instituciones financieras que operan en el Estado Libre Asociado de Puerto Rico.

25. Como corredor de hipoteca, Santurce Mortgage Brokers y/o Sr. Monteagudo González, sólo podía tramitar préstamos para sus clientes por medio de instituciones financieras debidamente autorizadas a otorgar préstamos hipotecarios.

26. El único real desembolso de dinero que el Sr. Monteagudo González y/o Santurce Mortgage Broker ha realizado fueron los $175,000.00 que se le entregaron al Lcdo. Angel L. Tapia Flores, el día 16 de agosto de 1991, como parte del precio de compraventa en la propiedad antes descrita, según escritura número 59, otorgada por el Notario Daniel Pernas Beceiro. Dicha cantidad de $175,000.00 fue inflada en dos ocasiones, primero a $212,000.00 y después hasta $296,000.00 simulando préstamos hipotecarios.

27. El pagaré hipotecario al portador por valor principal de $296,000.00, suscrito por el Sr. Eduardo Miranda Franco, el 9 de marzo de 1993 y la correspondiente Escritura de Constitución de Hipoteca (Número 17), otorgada por el Notario José González González fueron otorgados a instancia del Sr. Raúl Monteagudo González quien fue el primer tenedor del pagaré. El Sr. Monteagudo González le entregó dicho pagaré al Sr. José A. Matos Matos, aquí demandante.

28. No existe evidencia fehaciente alguna, ni confiable ni creíble que demuestre que la parte demandante le entregara cantidad alguna de dinero al Sr. Monteagudo González con el propósito de convertirse en tenedor de buena fe del mencionado pagaré hipotecario por valor principal de $296,250.00

29. La parte demandante nunca le ha prestado dinero al demandado Sr. Eduardo Miranda Franco, ni desembolsado dinero a su favor, ni le ha desembolsado, ni entregado dinero alguno al interventor Sr. Alex Ortiz Colón.

30. La parte demandante nunca le informó al demandado ni al interventor que era el tenedor del referido pagaré hipotecario al portador, por valor principal de $296,000.00, excepto cuando se radica la presente demanda, y se diligencia el emplazamiento en la persona del demandado Eduardo Miranda Franco. Nunca antes el demandado [sic] había iniciado gestión de cobro alguna contra el demandado y/o parte interventora. De hecho, aún después de radicada la demanda, el interventor continuó haciendo pagos de intereses mensuales al Sr. Monteagudo González y/o Santurce Mortgage Brokers.

*31. La prueba demostró que el demandante José A. Matos Matos ha tenido y/o tiene una estrecha relación de negocio con el Sr. Monteagudo González y/o Santurce Mortgage Brokers y que ha sido frente, pantalla y/o Alter Ego de éstos, en varios casos sobre ejecución de hipoteca que se han ventilado en los Tribunales de Puerto Rico. El demandante Matos Matos ha actuado como frente del Sr. Monteagudo González, al acudir a varios Tribunales para cobrar el monto de varios pagarés hipotecarios más los intereses, teniendo el conocimiento de que se desembolsaron cantidades menores a las que figuran en dichos pagarés hipotecarios y/o no se desembolsaron cantidades algunas.*

*32. El demandante Matos Matos tenía conocimiento en este caso de los negocios y trámites de los mismos entre el interventor y/o el demandado con el Sr. Monteagudo González y/o Santurce Mortgage Broker; actuando en concreto y común acuerdo con el propósito de defraudar al interventor Sr. Alex Ortiz Colón.*

*33. Los actos de los demandantes, incluyendo la presentación de la demanda y diligenciamiento del emplazamiento en este caso, le han causado al interventor daños mentales y angustias mentales. El interventor Sr. Alex Ortiz Colón ha sentido temor de perder su propiedad obtenida con esfuerzo, trabajo y sacrificio, de quedarse en la ruina económica, ya que la propiedad que se pretendía ejecutar, es la propiedad donde ubica el negocio conocido como El Polo Norte, único medio de sustento del interventor y su familia.*

*34. El demandado Eduardo Miranda Franco es y ha sido por años un trabajador y estibador de muebles, que reside en una casa alquilada y nunca había figurado como comprador de una propiedad inmueble en escritura alguna, salvo la escritura Número 16, del 9 de marzo de 1993, antes mencionada, en la cual nunca fue la intención de adquirir la propiedad del aquí interventor, ni adquirir el negocio de éste conocido como El Polo Norte."*

Sentencia apelada, a las págs. 4-12; Ap. Apel., a las págs. 140-148.

A raíz de las anteriores determinaciones de hechos, el Tribunal de Primera Instancia resolvió, como cuestión de derecho, que el contrato de compraventa realizado entre el interventor-apelado, Ortiz Colón, y el demandado-apelado, Miranda Franco, adolece de simulación por carecer de precio. Como vimos, ese negocio jurídico consta en la Escritura Número 16, otorgada el 9 de marzo de 1993 ante el Notario Público José González González.

A tales efectos, el tribunal resolvió que la compraventa figurada en la Escritura Núm. 16, *supra*, es una falsa o simulada, ya que no tiene causa verdadera, y que la transacción reflejada en la misma *"sirvió para llevar a cabo un esquema de fraude, no habiendo sido ese negocio ideado, propuesto o querido por el demandado ni el interventor"*. Sentencia apelada, pág. 16; Ap. Apel., pág. 152. Por lo tanto, resolvió el tribunal que contrario a lo expresado en la Escritura Número 16, no medió precio cierto o verdadero de compraventa o su equivalente en dinero o signo que lo represente que sea real y efectivo.

En cuanto al pagaré hipotecario al portador por valor de $296,250.00, el tribunal concluyó que es inválido por carecer de causa justa y lícita, ya que no se recibió suma ni prestación alguna a cambio de su constitución.

Con relación a la Escritura Número 17 sobre Constitución de Hipoteca en Garantía de Pagaré, el tribunal resolvió que dicho contrato de hipoteca no cumple con los requisitos establecidos en el Artículo 1756 del Código Civil, 31 L.P.R.A. sec. 5001 (Requisitos de los Contratos de Prenda e Hipoteca). Por ello, el tribunal decretó la nulidad e ineficacia de la hipoteca constituida mediante la Escritura Núm 17, *supra*.

Además, el tribunal concluyó que los demandantes-apelantes no son tenedores de buena fe del pagaré hipotecario al portador, *"ya que no tenía causa o la causa era ilícita, por lo cual no tenía efecto alguno y esto era conocido por el demandante, José A. Matos Matos"*. Id., pág. 20; Ap. Apel., pág. 156.

Por último, el tribunal resolvió lo siguiente con relación a la reclamación del interventor Ortiz Colón por daños y angustias mentales:

*"Los actos de la parte demandante y del Sr. Monteagudo González y/o Santurce Mortgage Broker le ocasionaron al interventor miedo y temor de perder su negocio conocido como "El Polo Norte" y de verse al mismo tiempo desacreditado permanente [sic] en su oficio. El interventor sufrió angustias al intentarse ejecutar una hipoteca nula e inexistente desde su orígen; y también sufrió angustias mentales ante el posible cierre y pérdida de su negocio del cual dependía para su sustento y el de su familia."*

[*Id.*, pág. 22; Ap. Apel., pág. 158.]

Luego de llegar a las anteriores conclusiones de derecho, el tribunal dictó sentencia en la que: (**1**) declaró nula e inexistente la Escritura Número 16, otorgada el 9 de marzo de 1993, ante el Notario José González González, en la cual figura como vendedor el interventor-apelado Colón Ortiz y como comprador el aquí demandado-apelado, Miranda Franco; (**2**) declaró nulo e ineficaz el pagaré hipotecario al portador, por valor de $296,250.00, suscrito por el demandado-apelado Miranda Franco el 9 de marzo de 1993 y otorgado ante el Notario José González González; (**3**) ordenó a los demandantes-apelantes, Matos Matos y Burgos, a entregar inmediatamente el referido pagaré al interventor Ortiz Colón para que éste proceda a su cancelación; (**4**) decretó nula e ineficaz la Escritura Núm. 17 sobre Constitución de Hipoteca en Garantía de Pagaré, otorgada el 9 de marzo de 1993, ante el Notario José González González, la cual grava la propiedad descrita anteriormente, por no cumplir el negocio jurídico allí descrito con el Artículo 1765 del Código Civil, *supra*; (**5**) ordenó al Registrador de la Propiedad, Sección Primera de Carolina, a que a petición de parte y presentación de la sentencia, proceda a cancelar en sus libros la inscripción y asientos correspondientes de las Escrituras Núm. 16 y 17, *supra*, previo el pago de los aranceles correspondientes; (**6**) declaró con lugar la reconvención del interventor contra los aquí demandantes-apelantes, Matos Matos y Burgos, por lo que se ordenó a la parte demandante-apelante al pago de $15,000.00 al interventor Ortiz Colón; (**7**) desestimó la demanda del interventor contra tercero, ya que no fueron emplazados; (**8**) se le impuso a los demandantes-apelantes, Matos Matos y otros, el pago de los gastos y costas del litigio y la cantidad de $10,000.00 por concepto de honorarios de abogado, por temeridad, y (**9**) ordenó que copia de la sentencia debe ser remitida al Procurador General del Departamento de Justicia, al Centro de Recaudación de Ingresos Municipales (CRIM), al Departamento de Hacienda y a la Oficina del Comisionado de Instituciones Financieras.

Inconformes con lo resuelto por el Tribunal de Primera Instancia, acuden antes nos, mediante recurso de apelación, los demandantes Matos Matos, Burgos y la sociedad legal de bienes gananciales por ellos compuesta. Alegan que erró el foro de primera instancia al apreciar la prueba y al llegar a conclusiones no sustentadas por la evidencia que obra en el expediente. En segundo lugar, alegan que erró el tribunal al decretar nula e inexistente la Escritura Número 16, *supra*. En tercer lugar, alegan que erró el foro de primera instancia al declarar nulo e ineficaz el pagaré hipotecario contenido en la escritura de hipoteca en garantía de pagaré, Escritura Núm. 17, *supra*. Por último, alegan que erró el tribunal al condenarles al pago de daños y de honorarios de abogado.

Contando con la comparecencia de todas las partes █ y con el beneficio de la exposición narrativa estipulada de la prueba, resolvemos.

## II

Conforme se desprende de la prueba testifical que tuvo ante sí el Tribunal de Primera Instancia, el Sr. Alex Ortiz decidió ejercer una opción de compra sobre la propiedad inmueble en controversia, la cual le pertenecía al Lcdo. Angel Tapia Flores y otros. E.N.P., pág. 8. Como paso previo para obtener el financiamiento, Ortiz Colón acudió a las Oficinas de Santurce Mortgage en donde se entrevistó con el Sr. Monteagudo. Al día siguiente de la entrevista, Monteagudo fue a ver la propiedad. E.N.P., pág. 8.

Monteagudo no le consiguió el financiamiento a Ortiz Colón. Ortiz Colón testificó bajo juramento que ante esa situación, Monteagudo le informó que hacían falta $25,000.00 para llevar a cabo la transacción y que él (Monteagudo) tenía dinero para prestarle, de manera que se pudiera llevar a cabo la compraventa. E.N.P., pág. 8.

Para obtener los referidos $25,000.00, la Sra. Gladys Negrón Cordero, compañera de Ortiz Colón, refinanció su casa. E.N.P., pág. 8. El día de la transacción, Monteagudo, representante de Santurce Mortgage, prestó al interventor Ortiz Colón el monto restante, es decir $175,000.00. E.N.P., pág. 8.

De acuerdo al testimonio del Lcdo. Tapia Flores (uno de los vendedores de la propiedad), el día de la compraventa se le entregó un cheque de $25,000.00 adquirido por Ortiz Colón en el banco y Monteagudo le entregó la cantidad restante de $175,000.00, en cheques. E.N.P., pág. 11. La venta finalmente se realizó por $200,000.00, mediante la Escritura Número 59. E.N.P., págs. 8 y 12.

En el día del cierre, el interventor Ortiz Colón firmó tres pagarés hipotecarios, dos con valor principal de $100,000.00 y otro de $12,000.00. E.N.P., pág. 9. El interventor Ortiz Colón testificó que se le informó que por el momento tendría que pagarle intereses mensuales a Monteagudo y que conseguir el financiamiento que necesitaba tomaría de dos a tres meses, quizás ocho como máximo. E.N.P., pág. 8. Testificó que pagaba mensualmente la cantidad de $1,766.00. E.N.P., pág. 9.

El interventor Ortiz Colón también testificó que en junio o julio de 1992 dejó de hacer sus pagos, ya que no se le cumplía con el financiamiento prometido y Monteagudo no se comunicaba con él. E.N.P. pág. 9. Entonces empezaron a enviar al Sr. Jorge M. Morales a cobrarle. E.N.P. pág. 9. Entonces Monteagudo se comunicó con él y le dijo que el financiamiento se iba a realizar. E.N.P., pág. 9.

El interventor Ortiz Colón manifestó que se le dijo que no cualificaba para el préstamo y que tenía que conseguir un amigo. E.N.P., pág. 9. Además, testificó que acudió a Santurce Mortgage con su amigo, el aquí demandado-apelado, Miranda Franco, a quien se le cualificó para el préstamo. E.N.P., pág. 9.

Testificó Ortiz Colón que se traspasó la propiedad a nombre de Miranda Franco. La fecha del cierre se llevó a cabo en marzo de 1993 y la cantidad de la transacción ascendió a $296,250.00. Los intereses mensuales ascendieron a $2,407.00. E.N.P., pág. 9.

El interventor Ortiz Colón también testificó que le traspasó simuladamente la propiedad a Miranda Franco. E.N.P., pág. 10. Añadió que el precio que aparece en la escritura es de $350,000.00. Declaró además que no hubo desembolso (de dinero) en la compraventa con Eduardo Miranda. E.N.P., pág. 11.

Por otro lado, el demandado-apelado, Miranda Franco, señaló que él y el interventor Ortiz Colón son los otorgantes de la Escritura Núm. 16 de compraventa, en controversia. Declaró que sus ingresos eran de aproximadamente $1,000.00 más unas propinas que recibía. E.N.P. pág. 17.

Explicó que le hizo un favor de darle a Ortiz Colón la firma para que se pudiera conseguir un financiamiento, por medio de Santurce Mortgage, en relación con la propiedad en controversia. E.N.P., pág. 17. Testificó Miranda Franco que fue a Santurce Mortgage para una precualificación e informó sus ingresos y que el 9 de marzo de 1993 firmó todos los documentos que el notario le dio y le dijo que firmara. E.N.P., pág. 17.

Miranda Franco testificó además que el día del cierre firmó las escrituras Números 52, 53 y 54 de Cancelación de Hipoteca, las cuales tenían otra fecha: el 14 de junio de 1993. E.N.P., pág. 18. Además testificó que *"no le ha pagado cantidad de dinero alguna al Sr. Axel Ortiz, quien siempre ha estado en posesión de la propiedad en controversia"*. E.N.P, pág. 18. Se reiteró en que no recibió ni entregó dinero alguno en ese día 9

de marzo de 1993. E.N.P., pág. 18.

## III
**Contrato de Compraventa y Simulación**

En la compraventa, uno de los contratantes se obliga a entregar una cosa determinada y el otro a pagar por ella un precio cierto en dinero o signo que lo represente. Art. 1334 del Código Civil, *supra*, sec. 3741. Precio verdadero quiere decir precio existente, precio real y efectivo. Es por esa razón que el precio es el elemento más característico de la compraventa. *Reyes v. Jusino*, 116 D.P.R. 275, 285 (1985). No puede haber compra y venta sin que haya precio verdadero, o lo que es lo mismo, sin que haya precio. J.M. Manresa, *Comentarios al Código Civil Español*, Madrid: Reus, Tomo X, Vol. I, 1969, a la pág. 80.

Bien es sabido que el Código Civil establece que se entiende por causa en los contratos onerosos, la prestación o promesa de una cosa o servicio por la otra parte; en los remuneratorios, el servicio o beneficio que se remunera, y en los de pura beneficencia, la mera liberalidad del bienhechor. Art. 1226, *supra*, sec. 3431. Puede deducirse entonces que *"para el vendedor la causa del contrato es la expresada percepción del precio, así como para el comprador lo es la adquisición de la cosa"*. Manresa, *supra*.

El derecho de contratos en nuestro ordenamiento jurídico descansa en la premisa inexorable de que no existe contrato sin causa o cuando la causa es ilícita. *"Los contratos sin causa, o con causa ilícita, no producen efecto alguno. Es ilícita la causa cuando se opone a las leyes o a la moral"*. Art. 1227 del Código Civil, *supra*, sec. 3432; *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 181 (1985). Cónsono con ello, nuestro Código Civil presume que todo contrato tiene causa y que ésta es lícita. No obstante, esa presunción admite prueba en contrario. *Ledesma Marrero v. Ledesma Marrero*, 84 D.P.R. 167, 169 (1961).

Por la marcada tangencia que tiene con la determinación de si en un contrato medió causa o no, procede que expongamos los lineamientos jurídicos de la figura de la simulación. La simulación se define como *"el acto o negocio jurídico que por acuerdo de las partes se celebra exteriorizando una declaración recepticia no verdadera para engañar a terceros, sea que ésta carezca de todo contenido, o bien que esconda uno verdadero diferente al declarado"*. *Díaz García v. Aponte Aponte*, 125 D.P.R. 1, 8 (1989).

La doctrina distingue entre la simulación relativa y la simulación absoluta. La simulación relativa surge cuando bajo una falsa apariencia se encubre un negocio realmente querido que los contratantes desean sustraer de la curiosidad o indiscreción de terceros. En ese tipo de casos, el Tribunal Supremo ha provisto para que, luego del cumplimiento de cierto requisitos, el contrato simulado quede eliminado y cobre vigencia el verdadero y disimulado. *Id.*, a la pág. 10.

Por otro lado, la simulación absoluta se da cuando el acto jurídico nada tiene de real y meramente crea la apariencia de un negocio. En otras palabras, se pretende la configuración aparente de un acto o negocio jurídico inexistente. *Reyes v. Jusino, supra*, pág. 283; *Hernández Usera v. Srio. de Hacienda*, 86 D.P.R. 13, 18 (1962). En estos casos, el contrato se considera **nulo, inexistente y no puede producir efectos jurídicos,** ya que carece del elemento de causa. *Sánchez Rodríguez v. López Jiménez, supra*; énfasis suplido.

En cuanto al elemento de causa en el contrato de compraventa y los efectos de la simulación se ha resuelto:

*"...que no medió precio ni su equivalente cuando en la escritura pública el notario no da fe de su entrega, o* ***si confesando los contratantes haberse éste verificado con anterioridad, no se justificare el hecho.*** *Ledesma Marrero v. Ledesma Marrero, 84 D.P.R. 167 (1961). Y es que en el otorgamiento de una escritura de compraventa el pago del precio no debe dejar lugar a dudas. No es 'suficiente la confesión de haberlo recibido, pues en ocasiones se finge ante el Notario una entrega que no es más que una farsa de los simulantes para*

*engañarle'. Cárcaba Fernández, op. cit., pág. 138.* **Esta exigencia responde a la necesidad de que el precio ineludiblemente exista, de lo contrario la venta sería simulada."**
*Díaz García v. Aponte Aponte, supra,* a las págs. 10 y 11; énfasis suplido.

Lo anterior va acorde con lo resuelto anteriormente por el Tribunal Supremo en *González Rodríguez v. Fumero,* 38 D.P.R. 556 (1928), donde se dijo que cuando la prueba demuestra que no hubo entrega de precio por el supuesto comprador y no salieron los bienes del poder del supuesto vendedor, no puede afirmarse que hubo contrato de compraventa, sino que no hubo contrato alguno.

Con relación a la prueba necesaria para probar la simulación, se ha dicho que con el propósito *"de restablecer la justicia, es preciso proporcionar a los terceros ajenos a la simulación un amplio abanico de medios probatorios, admitiéndose con un valor inusual la prueba de presunciones, en base a la cual se puede llegar a evidenciar la ficción de un negocio, incluso aunque conste en documento público".* Díaz García v. *Aponte Aponte, supra,* a las págs. 11 y 12; citas omitidas. A esos efectos, se reconoce que a través de medios indirectos de prueba, tales como testigos y presunciones, el juzgador de hechos podrá determinar con certeza razonable la ocurrencia de la simulación. *Id.,* a la pág. 12.

Conforme los testimonios vertidos y creídos en corte, el interventor Ortiz Colón no tenía intención alguna de vender su propiedad al demandado-apelado, Miranda Franco. Tanto Ortiz Colón como Miranda Franco acudieron a las oficinas de Monteagudo González h/n/c Santurce Mortgage Broker para que allí se ayudara a Ortiz Colón a conseguir un préstamo hipotecario (cosa que Santurce Mortgage no está autorizado a conceder). En ningún momento, Miranda Franco fue allí para adquirir por compra la referida propiedad.

Más aún, en la llamada *"transacción de compraventa"* no hubo el intercambio de prestaciones requerido para la configuración de dicho contrato. Específicamente, en dicha transacción no medió precio, elemento esencial para que una compraventa se catalogue como simulada. En otras palabras, surgió una simulación absoluta, ya que el *"negocio"* gestado no fue real. Como vimos, en estos casos el contrato se considera nulo, inexistente y no puede producir efectos jurídicos, ya que carece de causa.

Aunque en la escritura de compraventa se hizo constar que el monto de la transacción ascendía a $350,00.00, y que antes de la firma de la escritura se entregaron $120, 539.00, el tribunal no recibió prueba de que ese desembolso de dinero realmente existió. En ese sentido, tal y como ha resuelto el Tribunal Supremo, *"no medió precio ni su equivalente cuando los contratantes confiesan que se verificó el pago en momento anterior, pero luego ese hecho no se justificare".* Díaz García v. Aponte Aponte, supra. No es suficiente la confesión de haber recibido el dinero.

En este caso se dirimieron a nivel de primera instancia importantes cuestiones de hecho en donde el factor credibilidad jugó un papel muy importante. El tribunal entendió probado que ninguna persona natural o jurídica le prestó dinero al demandado-apelado Miranda Franco para llevar a cabo dicha transacción. El tribunal no recibió prueba en contrario. Recuérdese que la Oficina del Comisionado de Instituciones Financieras certificó que Monteagudo González h/n/c Santurce Mortgage Brokers es sólo un agente para conseguir financiamiento hipotecario, no un prestamista hipotecario reconocido como tal. No encontramos prueba que revierta tal hecho ni que demuestre que una institución debidamente autorizada desembolsó el monto de dinero requerido para la transacción. Sólo tenemos ante nos dos transacciones de *"compraventa"* de la misma propiedad en donde el alegado precio subió de forma considerable, y en donde el único desembolso que se hizo fue de $175,000.00 en la primera de las transacciones.

Además de la inexistencia del precio, el supuesto comprador, Miranda Franco, tampoco advino en posesión de la propiedad simuladamente adquirida. El tribunal estimó probado que éste nunca realizó actos de dominio sobre esa propiedad, la cual se mantuvo siempre bajo el dominio del interventor-apelado, Ortiz Colón. Tampoco

hay prueba en el expediente que controvierta esa determinación de hecho.

El demandante-apelante, Matos Matos, nos dice que aun entendiéndose la transacción como una simulada, la misma debe entenderse como una simulación relativa que oculta realmente una donación. El Tribunal de Primera Instancia no recibió prueba sobre ese hecho, es más bien un planteamiento que se trae en apelación sin base para fundamentarlo. Tampoco se nos ha puesto en condición para llegar a esa conclusión.

Por otro lado, nos dice el demandante-apelante, Matos Matos, que en dicha transacción sí medió precio, ya que el interventor apelado, Ortiz Colón, *"quedó liberado"* de las tres hipotecas que gravaban la propiedad. Escrito de Apelación, pág. 19. El demandante-apelante, Matos Matos, se refiere a los tres pagarés hipotecarios que suscribió el interventor Ortiz Colón al adquirir la propiedad el 16 de agosto de 1991. Veamos ese argumento a la luz de los documentos que obran en autos.

Se alega que con el monto de la transacción entre Ortiz Colón y Miranda Franco se cancelaron los referidos pagarés. En el apéndice del recurso se encuentran tres escrituras de cancelación de hipoteca, escrituras Número 52, 53 y 54, en las cuales aparece como compareciente el demandado-apelado, Miranda Franco. Las mismas tienen fecha de 14 de junio de 1993 (nótese que la alegada compraventa se efectuó el 9 de marzo de 1993) y están autorizadas por el Notario Público José González González. En las referidas escrituras, se expone que el demandado-apelado, Miranda Franco, es el dueño en pleno dominio de la propiedad antes referida y que por las escrituras número 61, 62 y 63, otorgadas el 16 de agosto de 1991, había constituido una hipoteca en garantía de pagarés por las cantidades de $100,000.00; $100,000.00 y $12,000.00. También se expone en dichas escrituras que el compareciente (Miranda Franco) **pagó el principal con sus intereses** y el acreedor le entregó el pagaré que evidencia dicha deuda para efectos de cancelación. Vésae Ap. Apel., pág. 30.

De entrada, notamos que quien firmó los pagarés supuestamente a cancelarse fue Ortiz Colón, cuando adquirió la propiedad con dinero prestado por el Sr. Monteagudo González h/n/c Santurce Mortgage Brokers. Miranda Franco no fue quien los suscribió como se expone en las referidas escrituras 52, 53 y 54. Ap. Apel., págs. 33, 37, 41. Tampoco se demostró que desembolsó cantidad alguna para dichas cancelaciones. Por cierto, esos gravámenes hipotecarios constan detallados en dos estudios de título realizados en dos fechas distintas: 31 de agosto de 1995 y 16 de abril de 1996. En ninguno de esos estudios de título consta que esas tres hipotecas efectivamente se cancelaron. Ni siquiera se desprende de los mismos que las referidas escrituras de cancelación se encuentran al menos presentadas en el Registro de la Propiedad para su inscripción.

Por lo tanto, en el expediente del recurso no encontramos prueba que nos mueva a catalogar como incorrecta la determinación de hechos número 19, la cual indica que *"las escrituras número 52, 53 y 54 nunca fueron presentadas al Registro de la Propiedad para la correspondiente cancelación."* Sentencia a la pág. 8; Ap. Apel., a la pág. 144. La parte demandante-apelante, Matos Matos y otros, tampoco presentó prueba para demostrar porqué esas escrituras no fueron canceladas. En otras palabras, para todos los efectos legales, los gravámenes continúan vigentes.

Ante todo lo anterior, es forzoso concluir que no tenemos ante nos fundamentos para cambiar la determinación del tribunal en el sentido de que en la transacción del 9 de marzo de 1993 no medió causa, por lo que la transacción es nula de pleno derecho. Por consiguiente, el error señalado no se cometió.

## IV
### Contrato de Hipoteca

La hipoteca es un derecho real perteneciente al acreedor (en razón de la inscripción y desde el momento de ésta), sobre los inmuebles del deudor o de un tercero, en virtud de cuyo derecho, no obstante conservar el deudor o tercero la posesión de la cosa hipotecada y la facultad de disponer de ella, el acreedor adquiere la

facultad de perseguirla, cualquiera que sea la mano en que se encuentre, a fin de ser pagado con el precio de la cosa, con la preferencia correspondiente al grado de su inscripción. *Liechty v. Descartes*, 109 D.P.R. 496 (1980).

Es requisito esencial de la hipoteca que ésta se constituya para asegurar el cumplimiento de una obligación principal. Art. 1765 del Código Civil, *supra*, sec. 5001(a). ■ El contrato de hipoteca es el que se constituye para asegurar y garantizar el cumplimiento de una obligación principal, careciendo de objeto el contrato cuando la obligación no subsiste. *Gautier v. Registrador*, 24 D.P.R. 704 (1917).

El carácter accesorio de la hipoteca explica que ésta subsista efectivamente mientras que el crédito que asegura tenga vida. Extinguido el crédito, se extingue la hipoteca; transmitido el crédito, se transmite la hipoteca; **y la nulidad o ineficacia del crédito provoca la nulidad o ineficacia de la hipoteca**. *Liechty v. Descartes, supra*, pág. 502; énfasis suplido.

*"[L]a escritura de hipoteca en garantía de un pagaré hipotecario al portador no es un contrato bilateral en el momento de su otorgamiento, ni puede ser considerada como tal hasta que el pagaré haya sido negociado por el deudor mediante su entrega a la persona que a su vez le entrega el importe del préstamo"*....Pero **tan pronto como el deudor recibe el importe del préstamo y el acreedor acepta el pagaré, como evidencia de la deuda**, la oferta contenida en la escritura de hipoteca se convierte en un contrato válido y obligatorio para una y otra parte contratante.

*Id.; Morales v. Registrador*, 54 D.P.R. 546, 548 (1939).

Como se ha visto, en ningún momento se probó que el demandado-apelado, Miranda Franco, hubiese recibido un préstamo que hubiese requerido la constitución de una hipoteca para garantizar su pago. En otras palabras, no hay obligación personal que garantizar. Por otro lado, el Artículo 1756 del Código Civil, *supra*, sec. 5001, establece como requisito del contrato de hipoteca que la cosa hipotecada pertenezca en propiedad a la persona que la hipoteca.

Como resolviera incontrovertidamente el foro de primera instancia, un contrato de compraventa en el que no medió causa es nulo por lo que ningún derecho de propiedad fue transmitido al demandado-apelado, Miranda Franco. He ahí también la incapacidad de Miranda Franco para hipotecar la referida propiedad. Por lo tanto, este error tampoco se cometió.

# V

## Tenedor de Buena Fe

La definición de tenedor de buena fe aparece en la Sección 2-302 de la Ley de Instrumentos Negociables, Ley Núm. 208 de 17 de agosto de 1995, 19 L.P.R.A. sec. 602. Dicha sección dispone que el tenedor de un instrumento será de buena fe si: (1) cuando fue emitido o negociado al tenedor, el instrumento no tenía evidencia aparente de falsificación o alteración ni era de tal forma irregular o incompleto como para que debiera cuestionarse su autenticidad; y (2) el tenedor tomó el instrumento: (i) **por valor**, (ii) **de buena fe**, sin tener aviso de que el instrumento estuviese en mora o hubiese sido desatendido o de que existiese un incumplimiento no subsanado respecto al pago de otro instrumento emitido como parte de la misma serie, (iii) sin tener aviso de que el instrumento contiene una firma no autorizada o ha sido alterado, (iv) sin tener aviso de la existencia de una reclamación contra el instrumento de las descritas en la sec. 2-306, y (v) **sin tener aviso de que una parte tenga una defensa o reclamación de resarcimiento de las descritas en la sec. 2-305(a).**

Aunque la buena fe es un término difícil de definir, se ha interpretado que los requisitos de **causa onerosa** ■ y de desconocimiento de defecto en el instrumento o en el derecho de la persona que lo negoció, nos

expresan lo que constituye la buena fe. Basilio Santiago Romero, *Tratado de Instrumentos Negociables*, Río Piedras: Editorial U.P.R., 2da. ed., 1981, a la pág. 168.

Con relación a las defensas oponibles a un tenedor de un instrumento negociable, la Sección 2-305 de la Ley de Instrumentos Negociables, *supra* sec. 605, establece que el derecho a exigir el cumplimiento de la obligación contraída por una parte en un instrumento, está sujeto a varias defensas que podrían ser levantadas por el deudor tales como: (1) minoría de edad del deudor, siempre que sea una defensa contra un contrato simple; (2) coacción, falta de capacidad legal o ilegalidad de la transacción que, bajo otra ley, anula la obligación del deudor, (iii) fraude que indujo al deudor a firmar el instrumento sin tener conocimiento ni oportunidad razonable de saber el carácter o los términos esenciales del instrumento, o (iv) la liberación del deudor en un procedimiento de insolvencia.

La ilegalidad de la transacción o ilegalidad de la causa está cimentada en que, como ya discutimos, los contratos sin causa o con causa ilícita no producen efecto alguno. Art. 1227 del Código Civil, *supra*. Se ha dicho que esta defensa es sólo de carácter personal, oponible únicamente contra un tenedor que no sea de buena fe, ni tenga los derechos de un tenedor de buena fe. Santiago Romero, *supra*, a la pág. 213. En otras palabras, en el caso de Puerto Rico, la defensa de ilegalidad de causa sería oponible al tenedor de buena fe, sólo si existiera una ley que declare nulo tal documento, cuando éste se expida o negocie por determinada causa ilícita. *Id.*

Dentro del tema de los instrumentos negociable, es importante destacar que el instrumento conocido como pagaré queda negociado por el endoso del tenedor, y se completa con la entrega. *Silva v. D.G.S.T. Two, Inc.*, 113 D.P.R. 747, 749 (1983). La importancia de ese hecho radica en que la mera entrega sin endoso lo que crea es una cesión, no una negociación. En ese sentido, el Tribunal Supremo, citando a Santiago Romero, nos dice que *"el cesionario de un documento no cualifica como tenedor de buena fe por derecho propio, y siendo así, dicho cesionario está sujeto a todas las defensas que puedan tener las partes precedentes en el documento"*. *Id.*

El demandante-apelante Matos Matos alega que erró el tribunal al declarar como ineficaz el pagaré suscrito por Miranda Franco y al determinar que él (Matos Matos) no era tenedor de buena fe. Entendemos que no se nos ha puesto en condición de atender este señalamiento de error. En el expediente del recurso sólo contamos con la copia del pagaré en cuestión, el cual fue anejado a la demanda. De dicha copia no se desprende que el documento cuente con algún endoso que demuestre que éste fue efectivamente negociado. Ese hecho es de vital importancia, ya que la negociación del pagaré es la que concede los derechos al tenedor de buena fe. Un mero cesionario no cualifica como tal, por lo que está sujeto a las defensas disponibles a las partes precedentes en el instrumento.

Decir aquí que ese endoso existe, sería altamente especulativo, más aún cuando en la determinación de hechos número 27, el tribunal expuso que *"[el] Sr. Monteagudo le **entregó** dicho pagaré al Sr. José Matos Matos"*. Sentencia a la pág. 10, Ap. Apel., a la pág. 148. Hacemos hincapié en que allí dice entregó, no dice negoció.

Sin embargo, y aun obviando el asunto del endoso, el tribunal estimó probado que Matos Matos conocía que el instrumento negociable carecía de causa. Precisamente ese es uno de los requisitos de un tenedor de buena fe: el desconocimiento del defecto en el instrumento. Al respecto queda indubitada la determinación de hechos número 32 en donde el tribunal resuelve que *"[e]l demandante Matos Matos tenía conocimiento en este caso de los negocios y trámites de los mismos entre el interventor y/o el demandado con el Sr. Monteagudo González y/o Santurce Mortgage; actuando en concreto y común acuerdo con el propósito de defraudar al interventor Sr. Alex Colón Ortiz"*. *Id.*, a la pág. 12; Ap. Apel., a la pág. 148.

Toda sentencia tiene una presunción de corrección. Por lo tanto, al carecer este Tribunal de prueba en contrario, el error señalado no fue cometido.

# VI

**Apreciación de la prueba**

El alcance de la revisión judicial sobre cuestiones de hecho está regulado por lo dispuesto en la Regla 43.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.2, la cual en lo pertinente dispone: *"las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto, a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos..."*.

Por ello, el Tribunal Supremo ha establecido que no debemos intervenir con las determinaciones de hechos que hace un tribunal de instancia. Tampoco debemos sustituir el criterio del juzgador ante quien declararon los testigos y quien tuvo la oportunidad de verlos declarar y apreciar su *"demeanor"*, a menos que se demuestre que dicho foro actuó con pasión, prejuicio o parcialidad. *Vélez v. Srio. De Justicia*, 115 D.P.R. 533, 545 (1984); *Ramos Acosta v. Caparra Dairy Inc.* 113 D.P.R. 357, 365 (1982).

Por lo tanto, la apreciación de la prueba efectuada por el Tribunal de Primera Instancia merece gran respeto y deferencia. *Monllor Arzola v. Sociedad de Gananciales*, 138 D.P.R 600, 610 (1995); *Sánchez Rodríguez v. López Jiménez, supra*, a la pág. 181; *Pérez Cruz v. Hospital La Concepción*, 115 D.P.R. 721 (1984).

Sin embargo, los tribunales apelativos pueden dejar sin efecto las determinaciones de hechos del foro de instancia, siempre que del examen de la totalidad de la evidencia el tribunal revisor quede definitivamente convencido de que un error fue cometido. Ese sería el caso donde las conclusiones de hecho están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida. *Maryland Casualty Co. v. Quick Const. Corp.*, 90 D.P.R. 329, 336 (1964).

El demandante-apelante, Matos Matos, alega que el tribunal erró al llegar a una serie de determinaciones de hechos. Al analizar el alcance de dichas determinaciones, notamos que las mismas, aun si fueran incorrectas, no tienen el efecto de afectar la médula de los asuntos realmente involucrados en esta controversia. Aun si entendiéramos que dichas determinaciones no están sustentadas por la prueba, ello no sería suficiente para revocar la sentencia apelada.

En primer lugar, Matos Matos expone que el tribunal erró al concluir que el Sr. Monteagudo le requirió a Ortiz Colón la cantidad de $25,000.00 para la primera transacción de compraventa. Aun si ello hubiese sido prueba de referencia inadmisible, el Lcdo. Tapia Flores confirmó el hecho al testificar que el día de la transacción recibió $25,000.00 por parte de Ortiz Colón y $175,000.00 por parte de Santurce Mortgage. Por otro lado, se declaró que la Sra. Negrón Cordero refinanció su propiedad para adquirir dicho dinero. En segundo lugar, Matos Matos alega que el Tribunal de Primera Instancia erró al exponer cantidades incorrectas. Ello de por sí no es un error perjudicial.

También impugnan los demandantes-apelantes, Matos Matos y otros, que el tribunal erró al resolver que Santurce Mortgage no consiguió el financiamiento a los apelados. Como ya vimos, no contamos en el recurso con prueba de que los apelados hubiesen recibido financiamiento por una institución autorizada para ello. Por otro lado, Matos Matos y otros, impugnan que el tribunal resolviera que eran un alter ego o pantalla de Santurce Mortgage *"por el mero hecho de que habían adquirido previamente instrumentos negociables a la referida entidad"*. Escrito de Apelación, pág. 15. El tribunal expuso que llegó a esa conclusión al tomar conocimiento judicial de otros casos con hechos similares a éste. Tampoco se nos ha puesto en condición de evaluar ese alegado error.

Al hacer un análisis general de la prueba, no se nos ha demostrado que las determinaciones de hechos del tribunal están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia

recibida. Por lo tanto, el tercer error señalado tampoco se cometió.

## VII

**Temeridad**

La Regla 44.1 (d) de Procedimiento Civil, *supra*, dispone que en caso de que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda corresponda a tal conducta.

Aunque el concepto de temeridad no está expresamente definido por dicha regla, se ha dicho que se *"trata de una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia. También sujeta al litigante a la ordalía del proceso judicial y lo expone a gastos innecesarios y a la contratación de servicios profesionales, incluyendo abogados"*. *Fernández v. San Juan Cement,* 118 D.P.R. 713, 718 (1987) (citas omitidas). Véase también *Miranda v. E.L.A.,* 137 D.P.R. 700 (1994).

El propósito principal de autorizar la imposición de honorarios de abogado en casos de temeridad es *"establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia o insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito"*. *Fernández v. San Juan Cement, supra.*

En primer lugar señalamos que los demandantes-apelantes, Matos Matos y otros, no discutieron en su escrito la razón por la cual el tribunal apelado alegadamente erró al imponerles el pago de una indemnización por los daños sufridos por el interventor Ortiz Colón. Por esa razón no discutiremos ese aspecto. En cuanto a la imposición de honorarios de abogado, entendemos que el tribunal no erró en su proceder. Al evaluar el expediente del recurso y al estudiar la sentencia apelada, notamos que los demandantes-apelantes insistieron en proseguir con un pleito fundamentado en la obstinación de cobrar unas *"acreencias"* de dudoso origen, las cuales, como vimos, carecían de toda legitimidad.

## VIII

Por los fundamentos antes expuestos, se confirma en su totalidad la sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Carolina.

Lo acordó y ordena el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2002 DTA 138

**1.** El propio demandante Matos Matos fue su único testigo. Los demás testigos fueron traidos por la parte demandada-apelada.

**2.** Aparentemente, el Tribunal de Primera Instancia erró al escribir la cabida en términos numéricos.

**3.** Conforme Certificación Registral con fecha de 14 de diciembre de 1995, la Finca 39206 se encuentra inscrita a los folios 41, 43, 43 vto. del Tomo 825 del Registro de la Propiedad, Sección I de Carolina.

**4.** Se refiere a los tres pagarés suscritos por el interventor Alex Ortiz Colón cuando adquirió del Lcdo. Tapia Flores la propiedad en controversia.

**5.** En el expediente del recurso se desprende una Certificación de la Oficina del Comisionado de Instituciones Financieras

en la cual se afirma ese hecho.

**6.** El demandado-apelado Miranda Franco adoptó como suyo el alegato del interventor-apelado; Ortiz Colón.

**7. §5001. Requisitos de los contratos de prenda e hipoteca**

*"Son requisitos esenciales de los contratos de prenda e hipoteca:*

*(1) Que se constituya para asegurar el cumplimiento de una obligación principal.*

*(2) Que la cosa pignorada o hipotecada pertenezca en propiedad al que la empeña o hipoteca.*

*(3) Que las personas que constituyan la prenda o hipoteca tengan la libre disposición de sus bienes o en caso de no tenerla, se hallen legalmente autorizadas al efecto."*

**8.** El tenedor de unos pagarés tiene a su favor una presunción de que adquirió el instrumento por causa justa y onerosa. *Arroyo Pratts v. Tribunal Superior*, 98 D.P.R. 149 (1969).